IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **Michelle Lee Tannlund**, on behalf of herself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**Real Time Resolutions, Inc.,**<br><br>Defendant. | Case No. 1:14-cv-5149<br><br>**Complaint**<br><br>Class Action<br><br>Jury Trial Demanded |

Plaintiff Michelle Lee Tannlund ("Plaintiff"), individually and on behalf of all others similarly situated, makes the following allegations and claims against Real Time Resolutions, Inc., ("Defendant"), upon personal knowledge, investigation of her counsel, and on information and belief.

1. This action seeks redress for business practices that violate the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA").

2. This Court has jurisdiction to grant the relief sought by Plaintiff pursuant to 47 U.S.C. § 227(b) and 28 U.S.C. § 1331.

3. Venue is proper in this district as Defendant resides within the district and does business here.

## Parties

4. Plaintiff Michelle Lee Tannlund is a natural person who resides in California. Plaintiff is the account holder of a cellular telephone number and pursuant to the terms of her contract is charged for each call within the meaning of 47 U.S.C. § 227(b)(1)(A)(iii).

Complaint—1

5. Defendant Real Time Resolutions, Inc. ("Real Time") is one of the largest non-originating servicers of real estate mortgage loans in the country and specializes in residual loan workouts, including non-mortgage debts, for other large financial institutions. It operates from its principal place of business at 1750 Regal Row, Dallas, Texas 75235. Real Time does business in every state including Illinois.

## Facts

6. Directly as well as through its subsidiaries, contractors and agents, Defendant employs hundreds of persons at various call centers throughout the country. These calling centers use automatic telephone dialing systems and computerized account information to track, record, and maintain the hundreds of thousands of accounts serviced by Defendant.

7. A significant portion, if not a majority, of Defendant's business operations are dedicated to servicing consumer loans that are in default, foreclosure, have been charged off by the original lender, or are subject to discharge in bankruptcy

8. Defendant's regular business practices include making repeated phone calls to persons it believes responsible for paying past-due accounts.

9. In 2005, Plaintiff borrowed money at an adjustable interest rate from Countrywide Financial, securing the repayment of the loan with a second-position lien on her home. She fell behind on her payments when the interest rate increased sometime in 2009. Soon thereafter Countrywide was purchased by Bank of America.

10. Beginning in 2011, Defendant took over servicing of the loan from Bank of America. The loan was still in default at the time Defendant assumed servicing and Plaintiff spent more than a year negotiating with Defendant to modify the terms of the repayment. The customer service representatives hired and supervised by Defendant

Complaint—2

were rude, abrasive, and insulting in their interactions with Plaintiff. She continued to insist that her income had drastically fallen, yet Defendant's representatives mocked her claim of financial hardship, telling her to give up her cell phone as it was "too expensive" and "get a smaller trash can" because she was, in their view, paying too much for garbage collection.

11. Defendant's employees threatened Plaintiff with foreclosure even though they knew that their loan was secured only by a junior lien and that the value of Plaintiff's home was significantly below the value of the first mortgage. Defendant further knew that the debt was a non-recourse obligation under California law because it had been incurred to acquire the property. Nevertheless, Defendant's employees insisted that their debt would survive foreclosure and threatened Plaintiff by saying that only a personal bankruptcy could eliminate the debt. Defendant also placed dozens of calls to Plaintiff's cellular telephone in an effort to collect on the debt, notwithstanding her constant requests that the calls cease.

12. Plaintiff filed complaints about Defendant's abusive and harassing tactics with state government officials in California and Texas, where Defendant is headquartered. She also sent a letter to President Obama in a desperate attempt to make the harassment stop and obtain a modification of the loan terms so she could retain her home. Much to her surprise, an official at the United States Treasury Department contacted Plaintiff and was able to connect her with an underwriter with modification authority.

13. The loan modification was finalized in 2012 and Plaintiff has been current on her obligation, paying in full and on time, ever since.

Complaint—3

14. Defendant, however, insists that she has missed a single payment in 2013. This is incorrect. Plaintiff made the payment in full and on time and has a copy from her bank of the cleared payment to Defendant, which she has sent over to Defendant's service center on more than one occasion. Nevertheless, Defendant's records continue to show her loan as delinquent, triggering Real Time's automatic dialer.

15. Defendant uses an automatic telephone dialing system to call Plaintiff's cellular telephone at regular intervals. Plaintiff frequently answers the phone, but is only rarely connected with a live person; the other times, the call is abruptly terminated. If she is able to speak to a servicing representative working for Defendant, she explains that the record of a missed payment is in error and invites the representative's attention to a notation in Defendant's file showing that the payment was, in fact, on time. She then asks that the calls stop and the representative typically agrees, but the calls continue unabated.

16. At no time did Plaintiff give her consent for Defendant to place such calls to her, nor did she list her cellular telephone number on the original application for the debt. Plaintiff is informed and believes and on that basis alleges that Defendant makes a regular practice of "skip tracing" new accounts to look for additional contact information. Plaintiff specifically requested on more than a dozen occasions that Defendant cease calling her, yet the calls continue.

17. Between January 1, 2013 and June 30, 2014, inclusive, Defendant placed at least one hundred calls at different times to Plaintiff's cellular telephone.

18. Each of the calls placed by Defendant was made by means of an automatic telephone dialing system as defined by the Federal Communications

Complaint—4

Commission. During some of the calls, Defendant left a message using an artificial or pre-recorded voice.

19. In 1991, Congress enacted the TCPA in response to a growing number of consumer complaints regarding certain telemarketing and debt collection practices. The TCPA regulates, *inter alia*, the use of automated dialing systems. Specifically, section 227(b)(1)(A)(iii) prohibits the use of autodialers to make any call to a wireless number in the absence of an emergency or the prior express consent of the called party. The TCPA's definition of an automatic telephone dialing system includes a "predictive dialer." *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 638-9 (7th Cir. 2012).

20. According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient. The FCC also recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used. *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014 (2003).

21. On January 4, 2008, the FCC issued a Declaratory Ruling confirming that autodialed and prerecorded message calls to a wireless number by a creditor or on behalf of a creditor are permitted only if the calls are made with the "prior express consent" of the called party. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* ("FCC Declaratory Ruling"), 23 F.C.C.R. 559, 23 FCC Rcd. 559, 43 Communications Reg. (P&F) 877, 2008 WL 65485 (F.C.C.) (2008).

Complaint—5

22. The FCC "emphasize[d] that prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed." *FCC Declaratory Ruling*, 23 F.C.C.R. at 564-65 (¶10).

23. Under the TCPA and pursuant to the FCC's January 2008 Declaratory Ruling, the burden is on Defendant to demonstrate that Plaintiff gave his express consent to Defendant to use an autodialer to call his cell phone within the meaning of the statute. *See FCC Declaratory Ruling*, 23 F.C.C.R. at 565 (¶ 10).

24. Plaintiff never listed her cellular telephone number in or on any documents during a transaction with Countrywide, Bank of America, or Real Time, nor did she subsequently give her express consent to receive calls on her cellular telephone.

25. In calling Plaintiff on her cellular telephone line multiple times at various times per day, Defendant violated 47 U.S.C. § 227(b).

## Class Action Allegations

26. Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23 on behalf of herself and on behalf of all others similarly situated.

27. The proposed Class that Plaintiff seeks to represent is defined as follows:

> All persons who had or have a number assigned to a cellular telephone service, which number was called by Defendant using an automatic telephone dialing system and/or an artificial or prerecorded voice within four (4) years of the filing of this complaint. Excluded from the class are persons who Defendant called for emergency purposes and persons who voluntarily provided their cellular telephone numbers to their original creditor during the transaction that resulted in the debt owed.

28. Collectively, these persons will be referred to as "Class members." Plaintiff represents, and is a member of, the Class. Excluded from the Class are

Defendant and any entities in which Defendant or their subsidiaries or affiliates have a controlling interest, Defendant's agents and employees, the judicial officer to whom this action is assigned and any member of the court staff and immediate family, and claims for personal injury, wrongful death, and emotional distress.

29. Plaintiff does not know the exact number of members in the Class, but based upon Defendant's public statements regarding their business in the United States and investigation of her counsel, Plaintiff reasonably believes that Class members number in excess of one hundred thousand. The Class size includes consumers who are obligated on debts serviced by Defendant, as well as persons who co-signed for those debts, and all other persons whom Defendant or their affiliates, agents, contractors, or employees dialed (or mis-dialed).

30. There are questions of law and fact common to the members of the Class that predominate over any questions affecting only individual members, including, whether Defendant made any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system and/or an artificial or prerecorded voice to any telephone number assigned to a cellular telephone service in violation of the TCPA.

31. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff.

32. Plaintiff will fairly and adequately protect the interests of the Class, and has retained attorneys experienced in class and complex litigation.

33. A class action is superior to all other available methods for the fair and efficient adjudication of the controversy for the following reasons:

    a. It is economically impractical for members of the Class to prosecute individual actions;

    b. The Class is readily definable; and

    c. Prosecution as a class action will eliminate the possibility of repetitious litigation.

34. A class action will cause an orderly and expeditious administration of the claims of the Class. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

35. Class wide relief is essential to compel Defendant to comply with the TCPA. The interest of Class members in individually controlling the prosecution of separate claims against Defendant is small because the statutory damages in an individual action for violation of the TCPA are small. Management of these claims is likely to present significantly fewer difficulties than are presented in many class claims because the calls at issue are all automated and the Class members, by definition, did not provide the prior express consent required under the statute to authorize calls to their cellular telephones.

36. Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief with the respect to the Class as a whole appropriate. Moreover, the TCPA violations complained of herein are substantially likely to continue in the future if an injunction is not entered.

### First Claim for Relief

37. Plaintiff re-alleges and incorporates by reference the above paragraphs as though set forth fully herein.

38. The foregoing acts and omissions of Defendant constitutes numerous and multiple violations of the TCPA, including but not limited to each of the above-cited provisions of 47 U.S.C. § 227.

39. As a result of Defendant's negligent violations of the TCPA, Plaintiff and Class members are entitled to an award of $500 in statutory damages for each and every call placed in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

40. Plaintiff and all Class members are also entitled to and do seek injunctive relief prohibiting such negligent conduct that violates the TCPA by Defendant in the future.

## Second Claim for Relief

41. Plaintiff re-alleges and incorporate by reference the above paragraphs as though set forth fully herein.

42. The foregoing acts and omissions of Defendant constitutes numerous and multiple knowing or willful, or both, violations of the TCPA, including but not limited to each of the above-cited provisions of 47 U.S.C. § 227.

43. As a result of Defendant's knowing and willful violations of the TCPA, Plaintiff and each member of the Class are entitled to treble damages of up to $1,500 for each and every call in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3).

44. Plaintiff and Class members are also entitled to and do seek injunctive relief prohibiting such willful conduct that violates the TCPA by Defendant in the future.

## Jury Trial Demand

45. Plaintiff demands a jury trial on each of the causes of action set forth above, including the amount of statutory damages.

Complaint—9

## **Prayers for Relief**

Wherefore, Plaintiff respectfully prays that judgment be entered against Defendant Real Time Resolutions, Inc., for the following:

1. An injunction against further violations;

2. Damages pursuant to 47 U.S.C. § 227(b)(3);

3. Costs of suit;

4. Reasonable attorneys' fees as part of a common fund, if any; and

5. Such other and further relief as the Court may deem just and proper.

Dated: July 7, 2014

ANKCORN LAW FIRM, PC

*/s/ Mark Ankcorn*
N.D. Illinois General Bar No. 1159690
California Bar No. 166871
*mark@ankcorn.com*

Attorneys for Plaintiffs

11622 El Camino Real, Suite 100
San Diego, California 92130
(619) 870-0600 phone
(619) 684-3541 fax

Local Office:
Ankcorn Law Firm, PC
1608 S. Ashland Ave. #92015
Chicago, Illinois 60608-2013