**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MICHELLE LEE TANNLUND, on behalf of herself and all others similarly situated, ) ) ) Plaintiff, ) ) v. ) ) REAL TIME RESOLUTIONS, INC., ) ) Defendant. ) | Case No. 1:14-cv-5149 <br><br> Honorable James B. Zagel |

**REAL TIME RESOLUTION'S MEMORANDUM IN SUPPORT OF**
**PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

**I.    INTRODUCTION**

This Memorandum addresses objections raised by Richard Hurrle ("Hurrle") to the proposed class settlement in this matter. Hurrle filed his own TCPA class suit against Real Time Resolutions, Inc. ("Real Time") in the Western District of Washington, but that action has been stayed for most of its existence. On January 6, 2016, the *Hurrle* court found that "the proceedings in *Tannlund* have advanced further than those in this case" and once again stayed the *Hurrle* matter to "ensure[] the Court and the parties do not waste time and resources addressing issues that may change or become moot." (*See* **Ex. 1**, Order Granting Defendant's Motion to Stay, *Hurrle v. Real Time Resolutions, Inc.*, Case No. C13-5765 BHS, slip op. at 5 (W.D. Wash. Jan. 6, 2016) ("Hurrle Stay Order").) The *Hurrle* court reasoned: "The proposed class will be compensated if their claims are meritorious. Moreover, Hurrle can still pursue his individual claims in this case by opting out of any settlement that may be approved by the *Tannlund* court." (*Id.*)

1

Seeking a share of the attorney's fees for this proposed class action settlement, Hurrle's counsel filed a motion to intervene, transfer or dismiss this action (Dkt. 28) as well as a supplement to that motion (Dkt. 48), both of which posed numerous objections to the proposed settlement. At the December 22, 2015 presentment of Plaintiff's Motion for Preliminary Approval of Class Action Settlement (Dkt. 45), this Court set a simultaneous briefing schedule for Hurrle, Real Time and Plaintiff Michele Tannlund to submit their arguments regarding Hurrle's objections. (Dkt. 49.) This Memorandum serves as Real Time's submission in support of preliminary settlement approval and in opposition to Hurrle's settlement objections.

Hurrle's objections are merely an attempt to litigate the underlying class claims against Real Time rather than a reasonable attack on the fairness of the proposed settlement terms. The settlement in this action was hard fought and negotiated over many months with the assistance of the Honorable Wayne Anderson (Ret.). While Hurrle's counsel casts aspersions on Tannlund's counsel, Mark Ankcorn, they conveniently fail to mention that Hurrle's counsel have partnered with Mr. Ankcorn as co-counsel on multiple class action cases. As discussed below, the objections that Hurrle and his counsel raise to the substantive terms of the proposed class settlement have no merit and should be rejected. Accordingly, the Court should grant preliminary approval to the proposed class settlement and allow the class notice to be published.

## II. HURRLE CANNOT USE THE CLASS SETTLEMENT FORUM TO LITIGATE THE MERITS OF HIS CLAIM.

The Seventh Circuit has admonished district courts not to get caught up in deciding the merits of a case rather than focusing on the fairness of a proposed class settlement:

> [W]e are mindful that the district courts have been admonished to refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights . . . . Our focus, then, is upon the general principles governing approval of class action settlements and not upon the substantive law governing the claims asserted in the litigation.

*Isby v. Bayh*, 75 F.3d 1191, 1196-97 (7th Cir. 1996) (internal quotation marks and citations omitted). Because "[f]ederal courts naturally favor the settlement of class action litigation," the inquiry for approving such settlements "is limited to the consideration of whether the proposed settlement is lawful, fair, reasonable, and adequate." *Id.* at 1196 (citing *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 888-89 (7th Cir. 1985)). The "essence of settlement is compromise" and "the parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution *after* trial." *Hiram Walker*, 768 F.2d at 889 (emphasis in original, citations omitted).

Because this Court has ordered simultaneous briefing, Real Time does not know every objection that Hurrle might raise. Real Time anticipates, however, that Hurrle will spend a good portion of his brief arguing why his TCPA claim has merit and why a class should be certified in his competing action in the Western District of Washington. But as the Seventh Circuit has held, this is not the appropriate forum for litigating the merits of Hurrle's class claim. *Isby*, 75 F.3d at 1196-97; *Hiram Walker*, 768 F.2d at 889. That is particularly true here because Hurrle's own lawsuit was stayed specifically to allow *this* Court to rule on the fairness of the proposed class settlement in this case. (*See* Ex. 1, Hurrle Stay Order at 5.)

In any event, discovery in the *Hurrle* action never was completed. As a result, Hurrle's counsel has an incomplete and flawed understanding of Real Time's policies and procedures for obtaining consent to make cell phone calls during the putative class period as well as the level of human intervention involved in making those calls. Hurrle himself is a poor class representative because he consented to have Real Time call his cell number when he provided that number to Real Time via a written short sale application submitted in May 2011. Hurrle's voluntary provision of his cell phone number constituted valid consent to call that number. *See In re Rules*

*& Regs. Implementing Tel. Consumer Prot. Act of 1991*, 7 FCC Rcd. 8752, 8769 ¶ 30 (Oct. 16, 1992) ("persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have been given, absent instructions to the contrary").

Hurrle's provision of his phone number is not expressly noted in Real Time's activity notes for his account because, while the goal of Real Time's notes is to record 100% of oral consents given by borrowers, Hurrle did not *orally* consent to receive calls. Rather, Hurrle gave his phone number to Real Time when he attempted to resolve his lien via a *written* short sale application. The fact that Real Time's account notes do not reflect that oral consent was given, does not mean Hurrle did not consent; indeed, Real Time was able to manually retrieve the written short sale application from its records and did produce those records to Hurrle's counsel. Thus, Hurrle himself is a good example of why simply reviewing Real Time's account notes would not provide a uniform methodology for certifying a class here or in the *Hurrle* matter. As class counsel's confirmatory discovery in this case revealed, determining whether consent was given by each putative class member would require a manual file-by-file review of every document provided and every oral conversation to determine if the cell phone number had previously been provided to Real Time, a prior servicer, or the original lender, either orally or in writing. There is simply no classwide methodology for making that determination.[1] Likewise,

---

[1] Real Time anticipates that Hurrle's counsel will try to assert that certifying a class is as simple as selecting accounts in which phone numbers were designated as a "pager" in Real Time's records. (Dkt. 48 at 3.) Again, this is a flawed assumption based on the limited discovery taken in the *Hurrle* matter. In fact, the "pager" designation includes situations where oral consent for cell phone calls had not been given to Real Time but where written consent may exist or where oral consent was given to a prior servicer or the lender. It also includes situations where Real Time was not sure whether the number was a cell phone or not at the time the call was made. Only individualized inquiries for each account could potentially determine whether consent to call a cell phone existed, whether Real Time had received a prior release from the borrower via a settlement, or whether other potential exceptions to liability exist. These individual inquiries render class certification unsustainable.

to the extent Hurrle is trying to certify a "revocation of consent" class, such a class would be plagued by individual fact issues and therefore cannot be certified. *See Wolfkiel v. Intersections Ins. Servs., Inc.*, 303 F.R.D. 287, 293-94 (N.D. Ill. 2014) (Zagel, J.) (finding that individual fact issues would predominate in a TCPA revocation class and no precedent exists for such a class).

**III. HURRLE'S OBJECTIONS TO THE CLASS SETTLEMENT HAVE NO MERIT.**

While Real Time cannot anticipate every possible objection Hurrle might raise to the proposed class settlement, the following sections respond to the objections he has raised so far. Each of these objections lacks merit or is premature. Real Time also reserves the right to respond to any additional objections or new purported "facts" that Hurrle might raise in his January 22 submission.

**A. The $17 Cash Payments and $200 Credits Provide Real Value to Settlement Class Members.**

**1. The $17 Cash Payments to Former Accountholders Exceed the Payouts in Comparable TCPA Settlements.**

The Settlement Agreement provides for $17 cash payments to each former accountholder who submits a valid claim. (Dkt. 45-1, Settlement Agreement ¶ 5.02(a).) While Hurrle challenges the $17 per claim amount as "minimal" (Dkt. 29 at 4), it was negotiated between the parties at arm's length and is well within the range for other TCPA class action settlements. *See, e.g.*, *Lambert v. Buth-Na-Bodhaige, Inc.*, No. 14-cv-00514, Dkt. 31-1, Final Approval Mem. at 8 (E.D. Cal. Oct. 23, 2015) ($25 gift card) (**Ex. 2**); *Couser v. Comenity Bank*, No. 12-cv-02484, Dkt. 91, Final Approval Order at 5 (S.D. Cal. May 27, 2015) ($13.75 cash payment) (**Ex. 3**); *In re Jiffy Lube Int'l Text Spam Litig.*, Case No. 3:11-MD-02261-JM-JMA, Dkt. 90-1, Final Approval Mem. at 8 (S.D. Cal. Dec. 30, 2012) ($12.97 cash payment or $17.29 off any Jiffy

5

Lube service offers) (**Ex. 4**); *Kazemi v. Payless ShoeSource, Inc.*, No. 09-cv-05142, Dkt. 85, Final Approval Mem. at 3-4 (N.D. Cal. February 21, 2012) ($25 merchandise certificate) (**Ex. 5**).

The $17 recovery per class member is particularly appropriate here given the substantial defenses that Real Time has raised to Plaintiff's and the putative class members' claims. In addition to the class certification problems described above, almost all phone calls at issue were made with human intervention, and a significant number were made without uploading the number to Real Time's dialer system. That distinguishes this action from the typical "robocall" case in which calls are made using a predictive or automated dialer. Given the human intervention involved in making these calls and the significant number of calls made where no cell number was uploaded to the dialer, the settlement negotiations appropriately reflected something less than the settlement amounts class members may have received in other TCPA cases. Likewise, the group of former accountholders entitled to receive the $17 payments include a substantial number of persons who Real Time called on behalf of a federal government controlled conservatorship. These calls potentially are exempt from liability if a court were to find that a recent amendment to the TCPA applies. *See* 47 U.S.C. § 227(b)(1)(A)(iii) (2015) (exempting "call[s] made solely to collect a debt owed to or guaranteed by the United States").

Hurrle also challenges the $270,000 cap placed on claims by former accountholders. The $270,000 cap provides for full payment of the $17 cash award for up to 15,882 claimants, which is 9.3% of the estimated 170,500 former accountholders who might file such claims. (Dkt. 45-3, Mark Ankcorn Decl. ¶ 10.) In counsel's experience, 9.3% is a generous estimate for the percentage of claims expected to be submitted in a TCPA class settlement. But even if more than 15,882 claims are submitted, class members still would receive a *pro rata* reduction of the $17 claim amount.

## 2. The $200 Credit to Current Accountholders Who Owe Significant Mortgage Debt Is A Real Benefit to Them.

In addition to the $17 cash payments to former accountholders, the Settlement Agreement also calls for credits of $200 to current accountholders who pay at least $2,000 on their outstanding debts during the one-year period after the settlement's Effective Date. (Dkt. 45-1, Settlement Agreement ¶ 5.02(b).) If a total of less than $2,000 is owed, the current accountholder can obtain a credit for 9.1% of the outstanding balance if the remainder is paid during the one-year period after the Effective Date. (*Id.*) These credits were a creative way of bridging the settlement gap during the lengthy negotiations between Real Time and Tannlund's counsel, and were fully supported by the professional mediator in this case, retired Northern District of Illinois Judge Wayne Anderson.

Hurrle objects to these credits on the basis that "class members must pay Real Time a substantial lump sum in order to receive a settlement benefit that is tiny in comparison." (Dkt. 29 at 5.) That assertion is wrong for a number of reasons. First, the class member need not pay the $2,000 (or lesser amount) in a "lump sum," as Hurrle contends; it is enough that the class member make smaller payments over the one-year period that add up to the required amount. Second, the required payments are not "substantial" when one considers the vast majority of these accounts involve *mortgage* payments where the homeowners often owe tens of thousands or even hundreds of thousands of dollars on their homes. Mortgage payments totaling $2,000 over a one-year period is hardly a substantial sum and not an onerous burden. Third, the settlement benefit is not "tiny" in comparison to the payment made. The credit ranges from 10% of the required $2,000 payment ($200) to 9.1% of any required payment that is less than $2,000. In short, the credits create a real benefit for current accountholders and the requirement for payment is not onerous.

## B. The Enhancements Made to Real Time's Calling Procedures Are Significant.

In addition to the monetary relief set forth above, the parties also agreed to certain "changes to Defendant's business practices" consisting of "significant enhancements to its calling systems designed to prevent the calling of a cellular telephone with an autodialer unless the recipient of the call has provided prior express consent." (Dkt. 45-1, Settlement Agreement ¶ 5.01.) Hurrle criticizes Real Time for not explicitly detailing those enhancements within the Settlement Agreement itself. (Dkt. 29 at 5.) That objection is specious; nothing requires the parties to set forth in the Settlement Agreement every detail of its proposed enhancements.

In any event, the enhancements to Real Time's calling system are substantial and are a continuation of Real Time's ongoing attempts to ensure its calling systems and policies are TCPA compliant. For example, a few years ago, Real Time implemented a change requiring that only a manual dialing process be used to call to all cell phone numbers. Pursuant to this change, cell numbers are not uploaded to the Five9 dialer system. Rather, all such numbers are first retrieved from Real Time's records and then manually entered twice (once for verification), digit by digit, before a call is manually made. And while this process is still in place today, Real Time has taken additional steps to improve its dialing processes and systems. On July 20, 2015, Real Time personnel visited the facility of its vendor, Five9, to conduct an audit and to make recommendations with respect to improvements to Five9's system. To this end, Five9 developed a manual touch/TCPA-compliant domain that incorporated Real Time's suggestions. On August 6, 2015, Real Time began to use this manual touch/TCPA-compliant domain, which creates a completely independent, non-automated calling process with no capacity to call in an automated fashion. Moreover, Real Time still does not upload any cell phone numbers to this new manual calling system, such that even if this system were completely mechanically refigured, it could not

be used to make calls to cell phones in an automated manner.  Real Time also has continued to update and supplement its policies and procedures over time to ensure that oral consents (and revocations) are effectively and enduringly tracked within its system, that its collection representatives are properly trained with respect to the aforementioned changes to its calling practices, and that these policies are properly and consistently audited.

Hurrle criticizes Real Time's prospective relief because it "does not take the form of an injunction." (Dkt. 29 at 5.)  Hurrle surmises that without this injunction, "Real Time could eliminate these changes as soon as the settlement is approved without suffering any adverse consequences." (*Id.*)  These objections are specious.  It is in Real Time's interest to ensure that its TCPA-compliant processes are implemented, not only because Real Time promised to do so under the terms of the Settlement Agreement but also to avoid any future TCPA liability.  Entering an injunction would merely be duplicative of what the law already requires.  Moreover, this Court certainly has the ability to force Real Time to comply with the prospective relief term of the Settlement Agreement, which would be incorporated into any Final Approval Order.

### C. Real Time Is Not Incentivized to Decrease Claims Rates.

Hurrle also criticizes the proposed settlement by characterizing it as "reversionary" and "designed to minimize participation (and therefore Real Time's payout) . . . ." (Dkt. 48 at 1-2.)  Hurrle is incorrect.  This is not a reversionary class settlement because it establishes no "settlement fund" that possibly could result in any reversion of funds to Real Time.  Rather, the agreement provides for a "claims-made" settlement with no reversionary aspect.  *See* 5 Newberg on Class Actions § 13:7 (William B. Rubenstein ed. 2015) ("A 'claims-made settlement' is a settlement that does not have a fixed settlement fund, but rather provides that the defendant will pay claims of class members who file them, usually up to some fixed ceiling.").  Instead, the

payout is a set amount that is dependent on the number of valid claims made by settlement class members. (Dkt. 45-1, Settlement Agreement ¶ 5.03.) As explained above, each former accountholder will receive a set cash amount of $17; all he or she needs to do is submit a valid claim. (*Id.* at ¶ 5.02(a).) Current accountholders need only file a claim and make the required $2,000 in payments over a one-year period to be eligible for a $200 credit. (*Id.* at ¶ 5.02(b).)

Hurrle's insinuation that Real Time is incentivized to reduce the number of claims submitted has no basis in fact. The $17 payments to former accountholders are capped at $270,000, which protects Real Time from having to pay more than this total amount. Because Real Time already is resigned to paying up to $270,000 for these claims, it has no real incentive to reduce the number of claims submitted. As for the $200 credits, which are dependent upon class members making at least $2,000 in total payments on their outstanding debts over a one-year period (or some lesser payment if the total debt is under $2,000), nothing would make Real Time happier than to see those debts paid. In other words, Real Time has every incentive to encourage claims to be filed because every $200 credit in turn incentivizes claiming class members to pay down their debts, which Real Time is in the business of collecting for its clients.

**D.     Publication Notice Is Justified Under the Circumstances of This Case.**

Hurrle also objects to the form of class notice proposed by the parties to this case. The Settlement Agreement provides for nationwide publication notice. (Dkt. 45-1, Settlement Agreement ¶ 9.01.) A copy of the proposed publication notice, which is Exhibit 3 to the Settlement Agreement, previously was filed with this Court at page 16 of Dkt. 45-2. The proposed notice plan includes (i) a one-third page advertisement in *People* magazine; (ii) 270,000,000 web impressions over a five-week period on various popular websites, such as Facebook, Google and Yahoo; and (iii) media outreach through the PR Newswire in both

English and Spanish language versions. (*See* **Ex. 6**, Linda Young Decl. ¶ 5 & Ex. B thereto.) Those who received calls from Real Time will recognize the company's name in these published notices because Real Time's agents were instructed to always identify Real Time on each call. The class notice administrator, AB Data, has submitted a sworn declaration opining that this proposed notice plan is designed to reach 72.9% of potential class members, which meets the minimum requirement of the 70-95% reach guideline referenced in the Federal Judicial Center's *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*. (*Id.* at ¶¶ 6-7.) The parties also have agreed to set up a settlement website containing a more detailed class notice along with the claim form and other relevant documents from the case. (Dkt. 45-1, Settlement Agreement ¶ 9.02; Dkt. 45-2 at 10-15.) In addition, the parties have agreed to maintain a toll-free telephone number that class members can call for further information and to answer their questions. (Dkt. 45-1, Settlement Agreement at ¶ 9.03.)

Federal Rule of Civil Procedure 23 provides that, "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *Medina v. Manfacturer's & Traders Trust Co.*, No. 04 cv 2175, 2004 WL 3119019, at *3 (N.D. Ill. Dec. 14, 2004) (Zagel, J.). "Notice by publication has been used in cases where potential class member names were confidential or impracticable to ascertain." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 476 (N.D. Ill. 2009) (Zagel, J.). That is the case here. Despite Hurrle's protestations, notice by publication is the only practicable option in light of the many procedural hurdles that prevent direct mail notice in this case. (Dkt. 45, Preliminary Approval Mot. at 19.)

First, Real Time owns none of the loans it services. Real Time's contracts with some of its major customers whose mortgage loans it services expressly prohibit the use of consumer

contact information for any purpose other than the collection of the debts at issue or to speak with certain mortgage holders about loan modification options. (Dkt. 45-3, Ankcorn Decl. ¶ 11.) Real Time strictly complies with these contractual provisions and does not share borrowers' personal information, including names and addresses, for any purpose not allowed by these contracts. (*Id.* at ¶ 12.) These contracts contain no exception for sharing such information with a third-party claims administrator for purposes of sending class notices. If the Court deems it helpful or necessary to review the relevant provisions of these contracts, Real Time requests leave to submit the excerpted confidentiality provisions to the Court for *in camera* review.

Second, roughly half of the 345,000 accounts at issue do not have current addresses associated with them. That is because approximately 170,500 of these accounts are no longer being serviced by Real Time as of November 10, 2015. (Dkt. 45-3, Ankcorn Decl. ¶ 10.)

Third, it is not possible to determine without individualized inquiries who did or did not consent to receive cell phone calls from Real Time. The Settlement Class was designed to be wide-reaching and essentially included all individuals in the Settlement Class who were called during the relevant time period, except those who were called solely on what was known to have been a landline when the calls were made. As a result, the 345,000 accounts associated with the Settlement Class encompass a variety of categories that arguably do not involve TCPA liability, such as those with: (i) calls to numbers whose categorization as a cell phone or landline was not known at the time the call was made (designated as "pager" in Real Time's system), but which were made with human intervention; (ii) calls similar to those in the preceding category that were made without uploading the number to Real Time's phone system; (iii) calls to borrowers who knowingly gave Real Time their oral consent; (iv) calls to borrowers who gave Real Time written consent or voluntarily provided their cell phone numbers to Real Time; (v) loan

modification calls made on behalf of a federal government controlled conservatorship; (vi) calls associated with persons who had executed releases of their claims; and (vii) accounts no longer being serviced by Real Time in one of the above categories. Directing individual mail notices to persons who received calls in these categories hardly seems an efficient use of resources.

In light of the restrictions contained in Real Time's contracts with its clients, the lack of current addresses for nearly half of the putative class members, and the sheer breadth of the Settlement Class definition, publication notice is the best notice practicable under these circumstances. Fed. R. Civ. P. 23(c)(2)(B).

In addition to challenging the notice procedure, Hurrle also objects to the claims process as imposing "unnecessary burdens on class members who file claims." (Dkt. 29 at 6.) However, the claims process here is very straightforward. Class members only need to complete a short claim form that asks them to provide their basic contact information and cell phone numbers that allegedly were called without prior consent, and then asks them to check a single box and sign and date the form. (*See* Dkt. 45-2 at 2-3.) The Settlement Agreement tasks the Claims Administrator with the job of approving claim forms. (*See* Dkt. 45-1, Settlement Agreement 8.01.) If any disputes arise, they can readily be addressed by the parties together with the Claims Administrator who ultimately will have the authority to approve the claim. (*Id.*) Contrary to Hurrle's contention, the parties have strewn no obstacles in the path of class members, and have made it very easy to submit a claim form.

### E. Any Objection to Class Counsel's Fee Is Premature.

Hurrle objects to Tannlund counsel's proposed attorney fee. (Dkt. 29 at 6; Dkt. 48 at 4.) However, class counsel has not yet made any request for attorney's fees; thus, analysis of any such request is premature at this time. The Settlement Agreement provides that Real Time will

not object to Tannlund's counsel's fee "in an amount *not exceeding*" $685,000. (Dkt. 45-1, Settlement Agreement ¶ 6.01 (emphasis added).) That provision does not commit class counsel to seeking the full amount of his fee. The fee amount actually requested will depend on the number of valid claims made during the claims period, and will need to comply with the Seventh Circuit's controlling tests in *Redman v. Radioshack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014), and *Pearson v. NBTY, Inc.*, 772 F.3d 778, 782 (7th Cir. 2014).

Hurrle also objects to the timing of the payment of class counsel's fee (30 days after the Settlement Agreement's Effective Date) compared with the one-year period by which current accountholders must make their $2,000 debt repayments in order to qualify for a $200 credit. (Dkt. 29 at 6; Dkt. 48 at 4; *see also* Dkt. 45-1, Settlement Agreement ¶¶ 5.02(b), 6.02.) However, by the time of class counsel's fee payment, the Court will know how many valid claims have been submitted by current accountholders and can reasonably estimate what percentage of those claims actually will make the required payments over the next year to obtain their $200 credits. That information should be sufficient to determine class counsel's fee. Alternatively, the Court could delay payment of a portion of class counsel's fee until all credits are actually redeemed. Section 6.04 of the Settlement Agreement provides that, "This Settlement is not dependent or conditioned upon the Court's approving Plaintiff's requests for attorney's fees," and "[i]n the event the Court declines Plaintiff's requests or awards less than the amounts sought, this Settlement shall continue to be effective and enforceable by the Parties." (Dkt. 45-1 at ¶ 6.04.)

Lastly, Real Time wishes to clarify – if it not already apparent from the terms of the Settlement Agreement itself – that any portion of the maximum $685,000 attorney fee that is not ultimately paid to class counsel will be distributed to the members of the class in a manner the

Court deems just and equitable. In other words, Real Time does not expect any portion of the $685,000 maximum fee amount to revert back to Real Time if class counsel's fees are reduced. This important fact distinguishes this settlement from the "reversion" or "kicker clause" that the Seventh Circuit found objectionable in *Pearson*, 772 F.3d at 786-87 (criticizing a clause providing that any reduction in class counsel's fees would revert back to the defendant and not the class).[2]

## IV. CONCLUSION

For all of the foregoing reasons, and those stated in Plaintiff Michelle Tannlund's Motion for Preliminary Approval of Class Action Settlement and her opposition to Hurrle's objections, Real Time respectfully requests that the Court grant preliminary approval of the proposed class settlement and authorize the class notice to be published in accordance with the notice plan.

Dated: January 22, 2016

Respectfully submitted,

**REAL TIME RESOLUTIONS, INC.**,

By: s/ Henry Pietrkowski
    One of Defendant's Attorneys

Abraham J. Colman (*pro hac vice*)
*acolman@reedsmith.com*
Reed Smith LLP
355 South Grand Avenue, Suite 2900
Los Angeles, California 90071
Ph: (213) 457-8075
Fax: (213) 457-8080

---

[2] This case is also distinguishable from *Pearson* and *Redman* in other important ways. As explained above, there is no evidence that the parties here have tried to disincentivize class claims or unduly increased class counsel fees relative to the amounts that claiming class members will receive. Nor is this settlement structured as a reversionary settlement fund, as was the case in *Pearson* and *Redman*. This case also involves no proposed *cy pres* distribution, worthless injunction or retail coupon settlement.

Henry Pietrkowski
*hpietrkowski@reedsmith.com*
Reed Smith LLP
10 South Wacker Drive, 40th Floor
Chicago, Illinois 60606
Ph:   (312) 207-3904
Fax: (312) 207-6400

David S. Almeida
*dalmeida@sheppardmullin.com*
David M. Poell
*dpoell@sheppardmullin.com*
Sheppard Mullin Richter & Hampton, LLP
70 W. Madison Street, 48th floor
Chicago, IL 60602
Ph:   (312) 499-6300
Fax: (312) 499-6301

# **CERTIFICATE OF SERVICE**

      I hereby certify that on January 22, 2016, I served the foregoing **Real Time Resolution's Memorandum in Support of Preliminary Approval of Class Settlement** by causing a true and accurate copy of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

                                                    /s Henry Pietrkowski
                                                    Henry Pietrkowski