# EXHIBIT
# 2

1  **NICHOLAS W. HORNBERGER, BAR NO. 53776**
   **NATHAN VERBISCAR-BROWN, BAR No. 286377**
2  **HORNBERGER LAW CORPORATION**
   633 W. Fifth Street, 28th Floor
3  Los Angeles, California 90071
   Tel (213) 488-1655
4  Fax (213) 488-1255

5  Attorneys for Plaintiff
   AIMEE LAMBERT and the CLASS

6

7                    **UNITED STATES DISTRICT COURT**

8                    **EASTERN DISTRICT OF CALIFORNIA**

9

10  AIMEE LAMBERT, an individual, on behalf     | Case No. 2:14-cv-00514-MCE-KJN
    of herself and all others similarly situated;
11                                               | **CLASS ACTION**
                     Plaintiff,
12                                               | **MEMORANDUM OF POINTS AND**
                                                 | **AUTHORITIES IN SUPPORT OF**
13  vs.                                          | *UNOPPOSED* **MOTION FOR FINAL**
                                                 | **APPROVAL OF CLASS ACTION**
14  BUTH-NA-BODHAIGE, INC., a Delaware           | **SETTLEMENT**
    corporation; RAZE MEDIA, INC., a Texas
15  corporation; and DOES 1 -50, inclusive       | Date:       November 12, 2015
                                                 | Time:       2:00 p.m.
16                   Defendants.                 | Courtroom:  7
                                                 | Judge:      The Hon. Morrison C. England
17

18

19

20

21

22

23

24

25

26

27

28
                                    - 1 -

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................. 1

II.     ALLEGATIONS AND PROCEDURAL HISTORY ....................................... 3

    A.    The TCPA ........................................................................................... 3

    B.    The Litigation .................................................................................... 6

    C.    The Settlement ................................................................................... 7

        1.    *The Settlement Class* ............................................................ 7

        2.    *The Settlement Fund* ............................................................ 7

        3.    *Benefit to the Class* ............................................................. 8

        4.    *Scope of Release* .................................................................. 8

        5.    *Class Representative's Incentive Award* ............................ 8

        6.    *Class Counsel's Application for Attorneys' Fees and Action Costs* ............... 9

III.    CLASS NOTICE HAS BEEN DISSEMINATED ......................................... 9

    A.    Direct Email and Direct Mailing of Notice to the Class ................... 9

    B.    Targeted Online Media Notice ........................................................ 10

    C.    Settlement Website and Toll-Free Number ..................................... 10

    D.    Settlement Administration Costs ..................................................... 10

IV.     THE CLASS HAS RESPONDED POSITIVELY TO THE SETTLEMENT ...................... 10

V.      THE COURT SHOULD GRANT FINAL APPROVAL TO THE SETTLEMENT ........... 11

    A.    The Settlement is Fair, Adequate, and Reasonable and Should be Approved .......... 11

        1.    *The Strength of the Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation* ............... 12

        2.    *The Risk of Maintaining Class Action Through Trial* ...................... 13

        3.    *The Amount Offered in the Settlement* ............................. 14

        4.    *The Extent of Discovery Completed and the Stage of the Proceedings* ........ 15

        5.    *The Experience and View of Class Counsel* ..................... 15

        6.    *The Presence of a Governmental Participant* ................... 16

        7.    *The Reaction of Class Members* ....................................... 16

- i -

TABLE OF CONTENTS

8.    *The Settlement is the Product of Arm's Length Negotiations* ...................... 16

VI.    CONCLUSION ......................................................................................... 17

- ii -
**TABLE OF CONTENTS**

1

## TABLE OF AUTHORITIES

2 **Federal Cases**

3 *Baird v. Sabre Inc.,*

4   2014 WL 320205 (C.D. Cal. Jan. 28, 2014)........................................................................ 4

5 *Boyd v. Bechtel Corp.,*

6   485 F. Supp. 610 (N.D. Cal. 1979) ....................................................................................... 15

7 *Churchill Village, LLC v. Gen. Elec.,*

8   361 F.3d 566 (9th Cir. 2004).......................................................................................... 11, 12

9 *Class Plaintiffs v. City of Seattle,*

10   955 F.2d 1268 (9th Cir. 1992) ............................................................................................. 11

11 *Gene And Gene LLC v. BioPay LLC,*

12   541 F.3d 318 (5th Cir. 2008).............................................................................................. 13

13 *Gomez v. Campbell-Ewald Co.,*

14   768 F.3d 871 (9th Cir. 2014)................................................................................................ 7

15 *In re Bluetooth Headset Prods. Liab. Litig.,*

16   654 F.3d 935 (9th Cir. 2011)............................................................................................... 16

17 *In re Omnivision Technologies, Inc.,*

18   559 F. Supp. 2d 1036 (N.D. Cal. 2007) ............................................................................. 15

19 *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report*

20 *and Order,*

21   27 F.C.C.R. 1830 (F.C.C. Feb. 15, 2012) ................................................................. 2, 3, 4, 5

22 *Kramer v. Autobytel, Inc.,*

23   759 F. Supp. 2d 1165 (N.D. Cal. 2010) ............................................................................. 3, 4

24 *Linney v. Cellular Alaska P'ship,*

25   1997 U.S. Dist. LEXIS 24300 (N.D. Cal. July 18, 1997) .................................................. 15

26 *Maier v. J.C. Penney Corp., Inc.,*

  2013 WL 3006415 (S.D. Cal. June 13, 2013) ....................................................................... 4

27

28

*Meyer v. Portfolio Recovery Associates,*
    707 F.3d 1036 (9th Cir. 2012) ................................................................. 13

*Officers for Justice v. Civil Serv. Comm'n,*
    688 F.2d 615 (9th Cir. 1982) ........................................................... 11, 12

*Satterfield v. Simon & Schuster, Inc.,*
    569 F. 3d 946 (9th Cir. 2009) ............................................................. 3, 4

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003) ................................................................. 12

**Statutes**

47 U.S.C. § 227 ............................................................................... 2, 3, 4, 6

**Rules**

Fed. R. Civ. P. 23 ..................................................................................... 12

**Miscellaneous Authorities**

4 *Newberg on Class Actions* § 11.25 (4th Ed. 2002) ................................. 11

4 *Newberg on Class Actions* § 11.41 (4th Ed. 2002) ................................. 11

*Manual for Complex Litigation* (Fourth) (2004) § 21.63 ......................... 11

## I.     INTRODUCTION

On July 29, 2015, this Court granted preliminary approval of the Settlement (the "Order"). *See* [Doc. 29]. Per the Court's Order, notice was issued to the approximate 225,252 members of the Settlement Class via email and first class mail (if no valid email address was available).  Notice via email was issued to the Settlement Class on or about August 10, 2015 and Notice via first class mail was issued on or about August 28, 2015. *See* Declaration of Teresa Y. Sutor of Heffler Claims Group in Support of Motion for Final Approval ("Heffler Decl.") at ¶¶ 10, 12.  Additional notice was given to members of the Class through the Settlement Website and the online media campaign. *Id*. at ¶¶ 7, 13.  Pursuant to the Court's Order, Class Members were provided until October 12, 2015 to opt out or object to the Settlement.  As of the date of this filing, no members of the Class have excluded themselves and none have objected.   *Id*. at ¶ 18.  This unanimously favorable reception that the Settlement has received from the Class  further evidences that the terms of the Settlement are fair, adequate, and reasonable.  Thus, and by this Motion, Plaintiff respectfully requests the Court conduct a final review of the Settlement and approve the Settlement as fair, reasonable, and adequate.

The Settlement represents a very good result for the Class.  Plaintiff and the Class alleged that Defendant Buth-Na-Bodhaige, Inc. dba The Body Shop ("TBS") unlawfully sent SMS or text messages to Plaintiff and the Class without their prior express written consent in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A). The Settlement requires TBS to pay $7,335,000 into a non-reversionary common fund ("Settlement Fund"), out of which Class Members will receive a twenty-five ($25.00) Gift Card for use at any TBS retail location in the United States. The Gift Card is redeemable for any merchandise offered for sale at any TBS U.S. retail location or online at www.thebodyshop-usa.com, and the Gift Card is freely transferrable. *See* Settlement at ¶1.11. Critically, Settlement Class Members *need not take any action* to receive a benefit from this Settlement.

The relief the Settlement provides is a very good result, particularly in view of the risks and delays involved in continued litigation, including the very substantial risk that the Federal

MPA ISO *UNOPPOSED* MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

1   Communications Commission ("FCC") would issue a ruling in response to one or more of the

2   multiple pending petitions before it that Plaintiff and the Class had no claim; or the ongoing risk

3   that the FCC's July 2014 Declaratory Ruling on those pending petitions could be reversed in whole

4   or in part as a result of the petitions currently pending before the District of Columbia Court of

5   Appeals. As such, considering the risks, the Settlement is an excellent result.

6          For the foregoing reasons and the others detailed below, the settlement readily meets the

7   standards for final settlement approval, and it should therefore be approved.

8   **II.     ALLEGATIONS AND PROCEDURAL HISTORY**

9          **A.      The TCPA**

10          The TCPA was enacted to "protect the privacy interests of residential telephone subscribers

11  by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate

12  interstate commerce by restricting certain uses of facsimile machines and automatic dialers."

13  *Satterfield v. Simon & Schuster, Inc.*, 569 F. 3d 946, 954 (9th Cir. 2009) (*quoting* S.Rep. No. 102–

14  178, at 1, 1991 U.S.C.C.A.N. 1968 (1991)).  Whether a plaintiff can maintain a claim under the

15  TCPA turns on the statutory language of 47 U.S.C. § 227(b)(1)(A)(iii).  *Kramer v. Autobytel, Inc.*,

16  759 F. Supp. 2d 1165, 1169 (N.D. Cal. 2010).  Section 227 of the TCPA, entitled "Restrictions on

17  use of telephone equipment," provides as follows:

18          (a) Definitions. As used in this section—

19          (1)  The term "automatic telephone dialing system" means equipment which has the
                 capacity—

20              (A)  to store or produce telephone numbers to be called, using a random or
                     sequential number generator; and

21              (B)  to dial such numbers.

22          (b)  Restrictions on use of automated telephone equipment.

23          (1)  Prohibitions. It shall be unlawful for any person within the United States, or any
                 person outside the United States if the recipient is within the United States—
                 (A) to make any call (other than a call made for emergency purposes or made with

24                   the prior express consent of the called party) using any automatic telephone
                     dialing system or an artificial or prerecorded voice—

25                   ...

26                   (iii) to any telephone number assigned to a paging service, cellular telephone
                         service, specialized mobile radio service, or other radio common carrier
                         service, or any service for which the called party is charged for the call.

27

28
                                                    - 3 -

1   *Kramer*, 759 F. Supp. 2d at 1169 (quoting 47 U.S.C. § 227).  Among other things, the TCPA made

2   it unlawful for any person to make any call (other than a call made for emergency purposes or

3   made with the prior express consent of the called party) using any automatic telephone dialing

4   system to any cellular telephone number. *Baird v. Sabre Inc.*, CV 13-999 SVW, 2014 WL 320205,

5   at *1 (C.D. Cal. Jan. 28, 2014).

6        A text message is a call within the meaning of the act. *Id.*; *Maier v. J.C. Penney Corp., Inc.*,

7   13CV0163-IEG DHB, 2013 WL 3006415 (S.D. Cal. June 13, 2013) (citing *Satterfield v. Simon &*

8   *Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir.2009)) ("The Ninth Circuit has established that text

9   messages (also referred to as SMS) are encompassed within the term 'call' as used in the TCPA

10   and are therefore subject to its restrictions.").

11        On October 16, 2013, the FCC's February 2012 Rule Making, interpreting the 1991

12   Telephone Consumer Protection Act, 47 U.S.C. section 227, went into effect. *See In re Rules and*

13   *Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order*, 27

14   F.C.C.R. 1830, 1837 ¶ 18, 1839 ¶ 20, 1858 ¶ 71 (F.C.C. Feb. 15, 2012) ("The 2012 Rule Making").

15   The 2012 Rule Making mandated that from October 16, 2013 going forward companies could no

16   longer rely on mere oral consent to send their text message solicitations to customers.  Instead, the

17   FCC required that as of that date companies needed to obtain "prior express written consent" before

18   sending text message solicitations to their customers. *See* 2012 Rule Making at ¶ 18.  The FCC

19   could not have been more clear – "[w]e believe that requiring prior written consent will better

20   protect consumer privacy because such consent requires conspicuous action by the consumer –

21   providing permission in writing – to authorize autodialed or prerecorded telemarketing calls, and

22   will reduce the chance of consumer confusion in responding orally to a telemarketer's consent

23   request." *Id.* at ¶ 24.

24        Not only did the FCC require written consent, but it also prescribed exactly what must be

25   contained in that written consent: "[A] consumer's written consent to receive telemarketing

26   robocalls must be signed and be sufficient to show that the consumer: (1) received 'clear and

27   conspicuous disclosure' of the consequences of providing the requested consent, *i.e.*, that the

28

1   consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific

2   seller; and (2) having received this information, agrees unambiguously to receive such calls at a

3   telephone number the consumer designates." *Id.* at ¶ 33.

4         Knowing that its new rules would significantly impact how businesses telemarket to

5   wireless phones, the FCC left a 12-month window (the window was later enlarged by 8 more

6   months) for businesses to re-design websites, revise telemarketing scripts, and prepare and print

7   new credit card and loyalty program applications and response cards to obtain consent from new

8   customers, as well as to exhaust existing supplies of these materials and create new record-keeping

9   systems and procedures to store and access the new consents they obtained. *Id.* at ¶ 67.  While the

10  FCC left a grace period, it also warned them:

11        Because allowing telemarketers to rely on [prior forms of consent] pending the
    effective date of our new written consent requirement would ease the operational
12        and technical transition for autodialed or prerecorded voice telemarketing calls, we
    find that it would serve the public interest to permit continued use of existing
13        consents for an interim period. For example, in cases where a telemarketer has not
    obtained prior written consent under our existing rules, we will allow such
14        telemarketer to make autodialed or prerecorded voice telemarketing calls until the
    effective date of our written consent requirement, so long as it has obtained another
15        form of prior express consent. ***Once our written consent rules become effective,
    however, an entity will no longer be able to rely on non-written forms of express***
16        ***consent to make autodialed or prerecorded voice telemarketing calls, and thus
    could be liable for making such calls absent prior written consent.***
17

18  *Id.* ¶ 68 (emphasis added).

19        Since the parties entered into the Settlement, the scope of potential liability under the TCPA

20  has continued to evolve.  On July 10, 2015, the FCC issued its Declaratory Ruling, resolving

21  multiple petitions pending before it, including the petition of the Coalition of Mobile Engagement

22  Providers that this Court noted in staying this Action. *See* Rules and Regulations Implementing the

23  Telephone Consumer Protection Act of 1991, Declaratory Ruling and Order CG Docket No. 02-

24  278, WC Docket No. 07-135, FCC 15-72 (rel. Jul 10, 2015) ("Declaratory Ruling").  As for the

25  Coalition's petition, the FCC noted "that some uncertainty in this regard may have existed prior to

26  the rule's effective date * * *." *Id.* at ¶ 100.   The FCC indicated that it would allow a retroactive

27  waiver for petitions before it on this issue. *Id.* at ¶ 102.

28

**MPA ISO *UNOPPOSED* MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

1    And other issues regarding the potential scope of TCPA liability remain unresolved.   The
2   FCC's Declaratory Ruling is now the subject of multiple petitions for review pursuant to the
3   Communications Act, 47 U.S.C. § 402(a), and the Hobbs Act, 28 U.S.C. § 2342(1).   These appeals
4   have been consolidated before the United States Courts of Appeal for the District of Columbia
5   Circuit.   A key issue in these petitions is whether and to what extent the FCC's interpretation of an
6   "automated telephonic dialing system"  (ATDS) as set forth in the Declaratory Ruling, comports
7   with the statutory definition.  *See* 47 U.S.C. § 227(a)(1).  Multiple courts have stayed TCPA actions
8   until the FCC resolves these petitions.  *See, e.g., Gensel v. Performant Techs.*, Case No. 13-C-
9   1196, 2015 U.S. Dist. LEXIS 142303 (E.D.Wis. October 20, 2015)(staying TCPA action pending
10   resolution of petitions challenging FCC's interpretation of ATDS definition).

11    **B.    The Litigation**

12    Plaintiff filed this Action on February 20, 2014 and alleged that TBS sent Plaintiff and the
13   Class unsolicited telemarketing text messages to their respective mobile phones from an ATDS,
14   and more importantly, without the required express written consent. [Doc. 1]. *See* Declaration of
15   Nicholas Hornberger in Support of Unopposed Motion for Attorneys' Fees, Costs and Incentive
16   Award ("Hornberger Decl.") at ¶ 3.   Thereafter, TBS moved this Court to stay or dismiss this
17   Action based upon various pending petitions for review before the FCC [Doc. 10].  *Id.*  This Court
18   granted TBS's motion to stay the Action on August 20, 2014 [Doc. 17].  *Id.*  As a result of this
19   Court's Order, and with both Parties fully aware as to the fact that any ruling by the FCC could
20   materially impact their respective positions in this case, the Parties opted to explore resolution of
21   this Action during the stay, and attended mediation with the Hon. Fred K. Morrison (Ret.) of JAMS
22   on March 24, 2015. *Id.*

23    Prior to mediation, the Parties exchanged significant information concerning the size of the
24   alleged class as well as information relating to Raze Media, the agent retained by TBS to send the
25   messages on behalf of TBS. *Id.* at ¶ 4.   At the mediation, the Parties reached an agreement to
26   resolve this Action.  Following mediation, the parties turned to finalizing the Settlement

27

28

**MPA ISO *UNOPPOSED* MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

1   Agreement, claim forms, notice documents, and preliminary approval papers. *Id.* Class Counsel

2   worked in close consultation with the Settlement Administrator throughout this process. *Id.*

3         Plaintiff submitted her *Unopposed* Motion for Preliminary Approval on June 11, 2015

4   [Doc. 24]. *Id.* at ¶ 5. On or about July 1, 2015, this Court entered an Order requesting the parties to

5   submit supplemental briefing regarding the impact, if any, that the United States Supreme Court's

6   grant of *certiorari* in *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871 (9th Cir. 2014) on the

7   Settlement [Doc. 26]. *Id.* On or about July 14, 2015, the parties filed their respective supplemental

8   briefings, each stating that neither believed *Gomez* would have any impact on the present case nor

9   the Settlement and requesting the Court enter an order granting preliminary approval [Docs. 27 and

10  28]. *Id.* On or about July 29, 2015, the Court entered an order granting preliminary approval,

11  ordering notice be sent to the Settlement Class, setting an "opt out/exclusion" deadline, setting a

12  deadline for Class Counsel to submit a motion for attorneys' fees, costs, and incentive awards, and

13  setting a hearing date for final approval [Doc. 29]. *Id.*

14      **C.**    **The Settlement**

15        The Settlement is the result of the Parties' participation in an all-day mediation session

16  before the Honorable Fred K. Morrison (Ret.) of JAMS and subsequent discussions, and has been

17  preliminarily approved by the Court as follows:

18          **1.**    *The Settlement Class*

19        As set forth in the Court's Order on Preliminary Approval, the "Settlement Class" is defined

20  as follows: "all individuals in the United States who received a text message by or on behalf of

21  TBS during the period of time from February 20, 2010 February 20, 2014, as reflected by the

22  combined records of Raze and TBS." [Doc. 29] at 4:15-18.

23          **2.**    *The Settlement Fund*

24        Under the Settlement, TBS is to provide gross Settlement Benefits (as defined in ¶1.26 of

25  the Settlement) in the amount of $7,335,000.00. The Settlement Benefits will fund the following:

26  (i) $25 Gift Cards (as defined in ¶1.11 of the Settlement) to each of the approximately 225,252

27  Settlement Class Members, i.e, greater than $5,600,000.00 to the Settlement Class; (ii) $130,000.00

28

**MPA ISO *UNOPPOSED* MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

1  the Settlement Administrator – Heffler Claims Group, LLC; (iii) an incentive award of $5,000.00 to

2  Plaintiff; and (iv) $1,600,000.00 (approximately 21.8% of the common fund) in attorneys' fees and

3  costs.

### 3.    *Benefit to the Class*

5       Each Settlement Class Member will be directly issued a twenty-five ($25.00) Gift Card for

6  use at any TBS retail location in the United States. The Gift Card is redeemable for any

7  merchandise offered for sale at any TBS U.S. retail location or online at www.thebodyshop-

8  usa.com, and the Gift Card is freely transferrable. *See* Settlement at ¶1.11. Codes for the gift cards

9  will be disseminated directly to Settlement Class Members following final approval, without any

10  requirement that Settlement Class Members submit a claim form.

### 4.    *Scope of Release*

12       The scope of the release by all Settlement Class Members (i.e., those who do not request

13  exclusion) includes any and all claims against the Released Parties (as defined in the Settlement at

14  ¶1.22) as follows:

> any and all actual, potential, filed, known or unknown, fixed or contingent, claimed or unclaimed, suspected or unsuspected, claims, demands, liabilities, rights, causes of action, contracts or agreements, extracontractual claims, damages, punitive, exemplary or multiplied damages, expenses, costs, attorneys' fees and/or obligations (including "Unknown Claims" as defined below), whether in law or in equity, accrued or unaccrued, direct, individual or representative, of every nature and description whatsoever, whether based on the TCPA or other federal, state, local, statutory or common law or any other law, rule or regulation, including the law of any jurisdiction outside the United States, against the Released Parties [defined in the Settlement at ¶1.22], or any of them, arising out of the facts, transactions, events, matters, occurrences, acts, disclosures, statements, representations, omissions or failures to act regarding the alleged receipt of text messages sent by or on behalf of TBS during the Class Period, including all claims that were brought or could have been brought in the Action, belonging to any and all Releasing Parties.

23  *See* Settlement at ¶1.23 and ¶1.31.

### 5.    *Class Representative's Incentive Award*

25       The Settlement contemplates that Class Counsel will request an incentive award in the

26  amount of $5,000 to be distributed to Plaintiff, subject to Court approval. TBS does not oppose this

27  request. *See* Settlement at ¶¶8.3-8.4. Plaintiff and Class Counsel filed their Motion for an Award

28

1    of Attorneys' Fees, Costs, and Incentive Awards [Doc. 30] on September 28, 2015.  To date, not a

2    single Class Member has objected to the requested attorneys' fees, costs, or incentive awards, nor

3    has any Class Member opted out of the Settlement.  *See* Heffler Decl. at ¶ 18.

4                    **6.    *Class Counsel's Application for Attorneys' Fees and Action Costs***

5             The Settlement contemplates that Class Counsel shall be entitled to apply to the Court for

6    an award of attorneys' fees and reimbursement of costs in the amount of $1,600,000.00, which is

7    less than 22% of the Settlement Benefit.  *See* Settlement at ¶8.1.  TBS does not oppose an

8    application by Class Counsel for an award of attorneys' fees and costs, as long as it does not exceed

9    this stated amount.  *Id.*  On or about September 28, 2015, Class Counsel filed and served their

10   Motion for an Award of Attorneys' Fees, Costs, and Incentive Awards with the Court.  *See* [Doc.

11   30]; *see also* Hornberger Decl. at ¶6.  In addition, a copy of the Motion for an Award of Attorneys'

12   Fees, Costs, and Incentive Awards was posted on the settlement website.  *Id.*; *see also* Heffler Decl.

13   at ¶ 7.

14   **III.    CLASS NOTICE HAS BEEN DISSEMINATED**

15            The notice program approved by the Court [Doc. 29] has been implemented by the parties

16   and the Court-approved Settlement Administrator in accordance with the Court's Order Granting

17   Preliminary Approval of Class Action Settlement.  *See* Heffler Decl. at ¶¶ 3-16.

18            **A.    Direct Email and Direct Mailing of Notice to the Class**

19            The Settlement Administrator provided notice in accord with Section 4 of the Settlement

20   Agreement and the Court's Order granting preliminary approval.   Specifically, Heffler timely

21   provided direct email and mail notice (Heffler Decl. at ¶¶ 10-12), along with targeted publication

22   notice consisting of banner notifications through designated social media outlets, including

23   Facebook and Twitter. Id. at ¶ 13.  In addition, the Settlement Administrator has maintained a

24   dedicated website (at www.thebodyshoptextsettlement.com), through which class notice and key

25   court filings could be viewed by class members.   The Settlement Administrator also disseminated

26   news of the settlement via press release, and also provided timely CAFA notice pursuant to 28

27   U.S.C. § 1715.  Heffler Decl. at ¶¶ 4, 14.

28

**MPA ISO *UNOPPOSED* MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

**B.    Targeted Online Media Notice**

In compliance with the Order, Heffler implemented an online media campaign that included Internet Banner ads appearing on Facebook, Twitter, and Millennial Mobile Media networks. The program commenced on August 13, 2015 and was completed on September 12, 2015, delivering more than 9,507,000 impressions. Internet banner ads provided information for visitors to self-identify themselves as potential Class Members, where they may "click" on the banner and then link directly to the official settlement website for more information including frequently asked questions and important court documents. *See* Heffler Decl. at ¶ 13.

**C.    Settlement Website and Toll-Free Number**

On or about August 10, 2015, the Settlement Administrator established a Settlement Website (www.thebodyshoptextsettlement.com) which contains the following: the Settlement Agreement and accompanying Notices; the Preliminary Approval Order, and the Revised Preliminary Approval Order; Class Counsel's Motion for Attorneys' Fees; Frequently-Asked Questions; the toll-free number; and an online contact form for individuals to determine whether they are included in the Settlement Class. *See* Heffler Decl. at ¶¶ 7-8.

**D.    Settlement Administration Costs**

The costs of settlement administration as of September 30, 2015 totals $87,583.35. *See* Heffler Decl. at ¶ 17.  Costs are not expected to exceed $130,000.00.  The Court has approved payment of up to $135,000.00 of the costs of the Settlement Administrator from the common fund. *See* [Doc. 29].  As an additional benefit to Class Members, these costs are borne by Defendant TBS.

**IV.    THE CLASS HAS RESPONDED POSITIVELY TO THE SETTLEMENT**

The response from the Class thus far has been very positive.  The deadline for Class Members to submit exclusions/objections has passed and no members of the Class have excluded themselves from the Settlement and none have objected to the Settlement. *See* Heffler Decl. at ¶ 18.

MPA ISO *UNOPPOSED* MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

## V.   THE COURT SHOULD GRANT FINAL APPROVAL TO THE SETTLEMENT

Federal courts strongly favor and encourage settlements, particularly in class actions and other complex matters, where the inherent costs, delays, and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (noting the "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned"); *see also* 4 *Newberg on Class Actions* § 11.41 (4th Ed. 2002) (citing cases).

The traditional means for handling claims like those at issue here—individual litigation—would require a massive expenditure of public and private resources and, given the relatively small value of the claims of the individual Class Members, would be impracticable. Thus, the proposed Settlement is the best vehicle for Class Members to receive the relief to which they are entitled in a prompt and efficient manner. The *Manual for Complex Litigation* (Fourth) (2004) § 21.63 ("*MCL*") describes a three-step procedure for approval of class action settlements:

> (1) Preliminary approval of the proposed settlement at an informal hearing;  (2) Dissemination of mailed and/or published notice of the settlement to all affected class members; and (3) A "formal fairness hearing" or final settlement approval hearing, at which class members may be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement may be presented.

This procedure, used by courts in the Ninth Circuit and endorsed by class action commentator Professor Newberg, safeguards class members' due process rights and enables the court to fulfill its role as the guardian of class interests. 4 Newberg § 11.25. The first two steps in this process have occurred. With this motion, Plaintiff respectfully requests that the Court take the third and final step in the process by granting final approval of the settlement.

### A.   The Settlement is Fair, Adequate, and Reasonable and Should be Approved

It is well settled that the law favors the compromise and settlement of class action suits. *See Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566, 576 (9th Cir. 2004); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *Officers for Justice v. Civil Serv. Comm'n*,

- 11 -

1   688 F.2d 615, 625 (9th Cir. 1982) ("[V]oluntary conciliation and settlement are the preferred

2   means of dispute resolution. This is especially true in complex class action litigation....").

3        A proposed class action settlement should be approved if the Court, after allowing absent

4   class members an opportunity to be heard, finds that the settlement is "fair, reasonable, and

5   adequate." Fed. R. Civ. P. 23(e)(2). When assessing a proposed settlement, "the court's intrusion

6   upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit

7   must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the

8   product of fraud or overreaching by, or collusion between, the negotiating parties, and the

9   settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for*

10  *Justice*, 688 F.2d at 625.

11       Courts in the Ninth Circuit consider a number of factors in evaluating class settlements,

12  recognizing that "it is the settlement taken as a whole, rather than the individual component parts,

13  that must be examined for overall fairness." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir.

14  2003). The Ninth Circuit has set forth the following list of factors to be considered: (1) the

15  strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further

16  litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount

17  offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6)

18  the experience and views of counsel; (7) the presence of a governmental participant; and (8) the

19  reaction of the class members to the proposed settlement. *Churchill Village*, 361 F.3d at 575.

20       Application of these factors here confirms that the settlement is fair, reasonable, and

21  adequate, and should be finally approved.

22       **1.**    ***The Strength of the Case and the Risk, Expense, Complexity, and Likely***

23             ***Duration of Further Litigation***

     Plaintiff and the Class continue to believe that their claims against TBS have merit and that

24  they could make a compelling case if their claims were tried.  If Plaintiff and the Class were to

25  prevail, TBS could face hefty statutory penalties. *See* Hornberger Decl. at ¶ 7. Nevertheless, it is

26  apparent that Plaintiff and the Class would face a number of difficult challenges if the litigation

27  were to continue. *Id*.  TBS has denied liability for the claims Plaintiff has asserted.  Further, both at

28

- 12 -

1   the time of the settlement was reached and afterwards, the strength or weakness of Plaintiff's

2   individual claims, as well as those of putative class members, remained of uncertain resolution.

3   Among other things, the potential for retroactive waiver of the October 2012 consent requirements,

4   as well as the uncertainty regarding the definition of ATDS, meant that some or all of the claims

5   might fail on the merits, or prove incapable of classwide adjudication , And even if Plaintiff were to

6   obtain certification, and she and the Class were to ultimately prevail at trial, a result that is not

7   guaranteed, they likely face a long and costly appeals process, that would depend in large part on

8   the outcome of pending proceedings before the D.C. Circuit Court of Appeal. *Id.*

9                    **2.    *The Risk of Maintaining Class Action Through Trial***

10          While Plaintiff continues to believe that class certification would be achievable, TBS

11   consistently argued that class certification would be inappropriate in these actions due to the

12   question of whether Class Members provided express written consent to the calls at issue. *Id.* at ¶ 8.

13   If the Court were to accept TBS's position, it is likely that no class would be certified and that

14   judgment would be entered in favor of TBS. *Id.*  Considering the fact that Courts have been divided

15   as to whether issues of "prior express consent" (let alone "express written consent") can be

16   adjudicated class-wide (*compare Meyer v. Portfolio Recovery Associates*, 707 F.3d 1036, 1042 (9th

17   Cir. 2012) (upholding class certification) *with Gene And Gene LLC v. BioPay LLC,* 541 F.3d 318,

18   328 (5th Cir. 2008) (reversing class certification)), if TBS were able to present convincing facts to

19   support its position, there is a risk that the Court would decline to certify the Class, leaving only the

20   named Plaintiff to pursue her individual claims. *Id.*

21          In addition, there were substantial risks in continuing this litigation.  The application of the

22   2012 consent requirements, the potential availability of a waiver as to such requirements, and the

23   outcome of the pending proceedings before the D.C. Circuit regarding the scope of the ATDS

24   definition would impact the claims of Plaintiff and putative class members, both on the merits and

25   in their suitability for classwide adjudication. *Id.* at ¶9.

26   / / /

27   / / /

28

**MPA ISO *UNOPPOSED* MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

### 3.    *The Amount Offered in the Settlement*

Critically, the Settlement provides for a ***direct benefit*** to each Settlement Class Member, meaning there is no claims process under which a Class Member is required to submit a claim form to receive a Gift Card.  Each Settlement Class Member will be directly issued a Gift Card in the amount of $25.00.  Thus, all Settlement Class Members (i.e., those who do not opt out) need take no action to receive the benefits of the Settlement. Courts have routinely approved such settlements.  *See Shames v. Hertz Corp.*, 2012 WL 5392159 at *13 (S.D. Cal. Nov. 5, 2012) (settlement was fair where the parties "negotiated a settlement that provide[d] direct payment to class members"); *Hopson v. Hanesbrands Inc.*, 2009 WL 928133, at *11 (N.D. Cal. Apr. 3, 2009) ("the benefits can be accurately traced because they are [] payments directly to Class Members"); *Briggs v. United States*, 2010 WL 1759457 (N.D. Cal. Apr. 30, 2010) (settlement was fair where it did not require class members to file claim forms).

The benefit each Settlement Class Member will receive is fair, appropriate, and reasonable given the purposes of the TCPA and in light of the anticipated risk, expense, and uncertainty of continuing the Action. Although the TCPA provides for statutory damages of $500 per violation, it is well-settled that a proposed settlement may be acceptable even though it amounts to a percentage of the potential recovery that might be available to the class members at trial. *See e.g., National Rural Tele. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004) ("well settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery"); *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 460 (E.D. Pa. 2000) ("the fact that a proposed settlement constitutes a relatively small percentage of the most optimistic estimate does not, in itself, weigh against the settlement; rather, the percentage should be considered in light of the strength of the claims").

And as the Ninth Circuit Court of Appeal has recently confirmed, a gift card are treated under federal statute "as an electronic form of cash."  *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 953 (9th Cir. 2015), citing 15 U.S.C. § 1693l-1 (affirming $12 gift card class settlement benefit).  And here, the gift cards provided to Class Members are freely transferrable and

- 14 -

1   do not expire (Agreement at 1.11), along the lines endorsed by the Ninth Circuit and district courts

2   within this Circuit.  *See id.* at 951 (citing with approval multiple settlements that awarded

3   transferrable and non-expiring gift cards as class benefit).

### 4.      *The Extent of Discovery Completed and the Stage of the Proceedings*

The Settlement was informed by Class Counsel's thorough investigation and analysis of

the factual and legal issues involved. *See* Hornberger Decl. at ¶ 11.  In addition, prior to engaging

in settlement negotiations, the parties had fully briefed TBS's Motion to Dismiss or Motion to Stay.

*Id.*

Once the parties agreed to engage in settlement negotiations, they informally exchanged

pertinent information and documents including case law and relevant rulemaking by the FCC. *Id.*

The parties also exchanged and reviewed informal post-settlement discovery to ensure that the

information exchanged during negotiations regarding call record data and the scope and size of the

class was complete and accurate. *Id.*  Through this exchange, the parties thoroughly explored their

respective positions on the merits of the action, the viability of class certification, and damages. *Id.*

Accordingly, while the action was settled prior to class certification, the final terms of

settlement were agreed to only after Class Counsel thoroughly vetted the claims and potential

damages through the exchange of both informal and formal discovery, and participated in lengthy

arm's length negotiations. *Id.*

### 5.      *The Experience and View of Class Counsel*

Class Counsel have a keen understanding of the legal and factual issues involved in this

case. *See* Hornberger Decl. at ¶ 12.  Class Counsel fully endorse the settlement as fair, adequate,

and reasonable. *Id.* The fact that qualified and well-informed counsel endorse the settlement as

being fair, reasonable, and adequate weighs heavily in favor of the Court approving the settlement.

*See In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2007) (*quoting*

*Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979)) ("The recommendations of

plaintiffs' counsel should be given a presumption of reasonableness."); *Linney v. Cellular Alaska*

*P'ship*, No. C-96-3008 DLJ, 1997 U.S. Dist. LEXIS 24300, at *16 (N.D. Cal. July 18, 1997) ("The

- 15 -

1   involvement of experienced class action counsel and the fact that the settlement agreement was

2   reached in arm's length negotiations, after relevant discovery had taken place create a presumption

3   that the agreement is fair.").

4          **6.**     ***The Presence of a Governmental Participant***

5          No governmental agency is directly involved in this lawsuit. *See* Hornberger Decl. at ¶ 13.

6   To date, no governmental entity has raised objections or concerns about the Settlement. *Id.*

7          **7.**     ***The Reaction of Class Members***

8          To date, there have no exclusions and no objections to the settlement.  That provides

9   abundant support for the fact that this settlement has been well-received by members of the Class.

10  *See* Heffler Decl. at ¶ 18.  This fact further supports that the settlement is fair, adequate, and

11  reasonable, and should be approved.

12         **8.**     ***The Settlement is the Product of Arm's Length Negotiations***

13         In addition to considering the above factors, the Ninth Circuit has indicated that the court

14  should carefully review the settlement for any signs of collusion or conflicts of interest. *See In re*

15  *Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). As detailed above, the

16  Settlement is the result of lengthy, adversarial arm's-length negotiations between attorneys

17  experienced in the litigation, certification, trial, as well as a full-day mediations presided over by a

18  well-respected mediator, the Hon. Fred K. Morrison (Ret.).  Further, none of the factors identified

19  in *In re Bluetooth* as a sign of potential collusion is present here.  In particular, class counsel is not

20  receiving a disproportionate distribution of the settlement; instead the amount sought is less than

21  25% of the total settlement benefit obtained.  *See Laguna v. Coverall North America, Inc.*, 753 F.3d

22  918, 925 (9th Cir. 2014)(where fee award is reasonable, "the chance of collusion narrows to a slim

23  possibility").  Further, class counsel is paid out of the Settlement Benefit (*see* Agreement at 1.26),

24  and rather than any "reversion to defendants of unclaimed funds" (*see ibid.*), the settlement directly

25  provides a gift card benefit to each class member.   Accordingly, considered as a whole and

26  balancing all terms the settlement, the Settlement should be approved.  *See ibid.* (district court

27  should balance all provisions of the settlement).

28

**MPA ISO *UNOPPOSED* MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

## VI.  CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court enter an Order granting final approval of the Settlement.

DATED:  October 23, 2015                    HORNBERGER LAW CORPORATION


                                            By: /s/ Nathan Verbiscar-Brown
                                                NATHAN VERBISCAR-BROWN, ESQ.
                                                CLASS COUNSEL

- 17 -