# EXHIBIT
# 4

Jay Edelson
jedelson@edelson.com
EDELSON MCGUIRE LLC
350 North LaSalle, Suite 1300
Chicago, IL 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378
*Lead Class Counsel*

Michael J. McMorrow
mjmcmorrow@smithmcmorrow.com
SMITH & MCMORROW P.C.
53 West Jackson Blvd., Suite 1663
Chicago, IL 60604
Telephone: (312) 546-6139
Facsimile: (888) 664-8172
*Lead Class Counsel*

Douglas J. Campion
LAW OFFICES OF DOUGLAS J. CAMPION
409 Camino Del Rio South, Suite 303
San Diego, CA 92108
Telephone: (619) 229-2091
Facsimile: (619) 858-0034
*Liaison Class Counsel*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

## SAN DIEGO DIVISION

| | |
|---|---|
| In re JIFFY LUBE INTERNATIONAL, INC. TEXT SPAM LITIGATION<br><br>This filing relates to: ALL CASES | No. 3:11-MD-02261-JM-JMA<br><br>MDL No. 2261<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Location:  Courtroom 16<br>Date: February 4, 2013<br>Time: 10:00 a.m.<br><br>The Honorable Jeffrey T. Miller |

## Table of Contents

I.      INTRODUCTION ................................................................................ 1

II.     NATURE OF THE LITIGATION ..................................................... 3

    A.      The Facts, the Law, and the Litigation History ........................ 3

    B.      The Mediation and Settlement Agreement .............................. 5

III.    THE TERMS OF THE SETTLEMENT AGREEMENT ................. 7

    A.      Class Definition ....................................................................... 7

    B.      Class Injunctive Relief ........................................................... 7

    C.      Individual Class Member Relief ............................................. 7

    D.      Other Relief ............................................................................. 8

        1.      *Payment of notice and administrative fees* ..................... 8

        2.      *Compensation for the class representatives* .................. 8

        3.      *Payment of attorneys' fees and expenses* ...................... 8

    E.      Release .................................................................................... 9

IV.     THE IMPLEMENTED NOTICE PLAN COMPORTS WITH DUE PROCESS ...... 9

V.      THE SETTLEMENT WARRANTS FINAL APPROVAL ........... 11

    A.      The Strength of the Plaintiffs' Case ...................................... 12

    B.      The Risk, Expense, Complexity and Likely Duration of Further Litigation ........................................................................ 15

    C.      The Risk of Maintaining Class Action Status Throughout the Trial ...... 16

    D.      The Amount Offered in Settlement ....................................... 16

    E.      The Extent of Discovery and the Stage of the Proceedings ....... 19

    F.      The Experience and Views of Counsel .................................. 21

    G.      The Presence of a Governmental Participant ......................... 22

    H.      The Reaction of the Class Members to the Proposed Settlement ...... 22

        1.      *The Palmer Objection fails to show that the Settlement is a "coupon settlement."* ...... 24

        2.      *The Palmer Objection fails to demonstrate the need for a cy pres distribution.* ...... 26

        3.    *The Palmer Objection fails to show that the fee award is excessive.* ..... 27

        4.    *The other objections.* .................................................................. 31

    I.    **There is No Evidence of Collusion** ................................................. 33

VI.    **CONCLUSION** ...................................................................................... 35

1

### Table of Authorities

2

**United States Supreme Court Cases:**

3
*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) .......................................................................... 27

4
*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) ...................................................................... 9

5
*Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740 (2012) ............................................................ 4, 31

6
*Protective Comm. for Indep. Stockholders v. Anderson*, 390 U.S. 414 (1968) ............................. 13

7
**United States Circuit Court of Appeals Cases:**

8
*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ................................. 11, 22, 33

9
*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ................................................ 11

10
*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) .......................................................................... 20

11
*Dennis v. Kellogg*, 697 F.3d 858 (9th Cir. 2012) .......................................................................... 29

12
*Gene and Gene, LLC v. Biopay LLC,* 541 F.3d 318 (5th Cir. 2008) ............................................. 14

13
*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ..................................................*passim*

14
*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ............... 27, 33, 34, 35

15
*In re Mego Fin. Corp. Sec. Litig.,* 213 F.3d 454 (9th Cir. 2000) ............................... 19, 20, 22, 33

16
*In re Mercury Interactive Corp.*, 618 F.3d 988 (9th Cir. 2010) ..................................................... 7

17
*In re Mexico Money Transfer Litig.*, 267 F.3d 743 (7th Cir. 2001) .............................................. 24

18
*In re Pac. Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995) .......................................................... 21

19
*In re Wireless Tele. Fed. Cost Recovery Fees Litig.,* 396 F.3d 922 (8th Cir. 2005) ..................... 18

20
*Lane v. Facebook, Inc.,* 696 F.3d 811 (9th Cir. 2012) ............................................... 11, 17, 19, 32

21
*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir.1998) ................................... 19, 20, 33

22
*Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173 (9th Cir.1977) ................................................. 22

23
*Mendoza v. Tucson Sch. Dist. No. 1,* 623 F.2d 1338 (9th Cir.1980) ............................................. 9

24
*Moore v. City of San Jose*, 615 F.2d 1265 (9th Cir. 1980) .......................................................... 23

25
*Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011) .............................................................. 26

26
*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 (9th Cir. 1982)....................... 11, 12, 15

27
*Powers v. Elchen*, 229 F.3d 1249 (9th Cir. 2000) ....................................................................... 34

28
*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002)................................................ 28

*Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009)............................ 12, 15, 17, 28, 32

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) ........................................ 4, 13

*Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990) ............... 26, 27

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ....................................................................... 34

*U.S. v. Oregon*, 913 F.2d 576 (9th Cir. 1990) ................................................................................. 23

*Wing v. Asarco Inc.*, 114 F.3d 986 (9th Cir. 1997) ........................................................................ 27

**United States District Cases:**

*Abbas v Selling Source, LLC*, No. 09-CV-3413, 2009 WL 4884471 (N.D. Ill. 2009) ................. 13

*Agne v. Papa John's Int'l, Inc.*,
    No. C10-1139-JCC, 2012 WL 5473719 (W.D. Wash. Nov. 9, 2012) ........................ 13, 16

*Arthur v. Sallie Mae, Inc.*, No. C-10-198JLR (W.D. Wash. 2012)................................................ 23

*Bellows v. NCO Fin. Sys., Inc.*,
    No. 07-CV-01413-W-AJB, 2008 WL 5458986 (S.D. Cal. Dec. 10, 2008) ............... 15, 20

*Berger v. Property I.D. Corp.*, No. 05-5373 GHK (C.D. Cal. Jan. 28, 2009) ............................. 23

*Chakejian v. Equifax Info. Services, LLC*, 275 F.R.D. 201 (E.D. Pa. 2011)................................ 24

*Domonoske v. Bank of Am., N.A.*, 790 F.Supp.2d 466 (W.D. Va. 2011) ...................................... 31

*Gardner v. GC Services, LP*,
    No. 10-CV-0997-IEG CAB, 2012 WL 1119534 (S.D. Cal. Apr. 2, 2012)................ 16, 19

*Garner v. State Farm Mut. Auto. Ins. Co.*,
    No. CV-08-1365 CW EMC, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ............. 12, 22

*Glass v. UBS Fin. Services, Inc.*,
    No. C-06-4068 MMC, 2007 WL 221862 (N.D. Cal. Jan. 26, 2007) ............................... 22

*Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723 (N.D. Ill. 2011)........................ 13

*Hartless v. Clorox Co*, No. 06-cv-02705-CAB (S.D. Cal.)............................................................. 23

*Hartless v. Clorox Co.*, 273 F.R.D. 630 (S.D. Cal. 2011)......................................................... 23, 33

*Ibey v. Taco Bell Corp.*,
    No. 12-CV-0583-H WVG, 2012 WL 2401972 (S.D. Cal. June 18, 2012) ...................... 14

*In re Broadcom Corp. Class Action Litig.*, No. 06-cv-5036-R (C.D. Cal.) ................................. 23

*In re Dell Sec. Litig.*, No. A-06-CA-726-SS, 2010 WL 2371834 (W.D. Tex. June 11, 2010)..... 23

*In re Herley Indus., Inc. Sec. Litig.*, No. 06-CV-2596 (JRS) (E.D. Pa. 2010) ............................ 23

*In re Initial Public Offering Sec. Litig.*, No. 21-MC-92 (SAS) (S.D.N.Y. 2009) ........................ 23

*In re Lawnmower Engine Horsepower Mktg. & Sales Practice Litig.*,
  No. 08-MD-01999 (E.D. Wis. 2010) ...................................................................23

*In re Mercury Sec. Litig.*, No. 05-cv-03395-JF (N.D. Cal.) ..........................................23

*In re MoneyGram Int'l, Inc. Sec. Litig.*, No. 08-CV-883 (D. Minn. 2010)......................23

*In re Napster Inc. Copyright Litig.*,
  MDL 00-1369 MHP, 2005 WL 1287611 (N.D. Cal. June 1, 2005) ..............................29

*In re: Static Random Access Memory (SRAM) Antitrust Litigation*,
  No. 07-md-01819-CW, (N.D. Cal. Sept. 14, 2011) ....................................................23

*In re TD Ameritrade Account Holder Litig.*, Nos. C 07–2852 SBA,
  C 07–4903 SBA, 2011 WL 4079226 (N.D. Cal. Sept. 13, 2011) ...............................32

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  MDL 07-MD-1827 SI, 2011 WL 7575004 (N.D. Cal. Dec. 27, 2011)..........................31

*In re: Uponor, Inc.*, 11-MD-2247 ADM/JJK (Minn. Sept. 11, 2012) .............................23

*In re Warner Communications Sec. Litig.*, 618 F.Supp. 735 (S.D.N.Y.1985).................20

*Kazemi v. Payless Shoesource, Inc. et al*, No. CV-09-5142 (N.D. Cal. April 2, 2012) ...............19

*Kenro, Inc. v. Fax Daily, Inc.*, 962 F. Supp. 1162 (S.D. Ind. 1997) ...............................16

*Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165 (N.D. Cal. 2010) ................................13

*Laguna v. Coverall N. Am., Inc.*,
  No. 09-CV-02131-JM BGS, 2012 WL 607622 (S.D. Cal. Feb. 23, 2012) ...................17

*Lewis v. Starbucks Corp.*, No. 07-cv-00490, 2008 WL 4196690 (E.D. Cal. Sept. 11, 2008) .......12

*Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005)................................20

*Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999 (N.D. Ill. 2010) ...................4

*Martin v. AmeriPride Services, Inc.*, No. 08-CV-440-MMA JMA,
  2011 WL 2313604 (S.D. Cal. June 9, 2011) ...........................................12, 13, 16, 21, 33

*McNamara v. Royal Bank of Scotland Group, PLC*,
  No. 11-CV-2137-L WVG, 2012 WL 5392181 (S.D. Cal. Nov. 5, 2012) ......................14

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004) ...........15, 21

*O'Brien v. Brain Research Labs, LLC*,
  No. 12-cv-204 2012 WL 3242365 (D.N.J. Aug. 9, 2012) ..........................................32

*Pelletz v. Weyerhaeuser Co.*, 255 F.R.D. 537 (W.D. Wash. 2009) ................................22

*Radosti v. Envision EMI, LLC*, 717 F.Supp.2d 37 (D.D.C. 2010) ...................................25, 29, 33

*Rodriguez v. West Publ'g Corp.*,
  No. 05-CV-3222 R (MCx), 2007 WL 2827379 (C.D. Cal. Sept. 10, 2007) ..................23

*Shames v. Hertz Corp.,*
    No. 07-CV-2174-MMA WMC, 2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) ..... 13, 15, 26

*Sullivan v. Kelly Services, Inc.,* No. 08-cv-03893-CW (N.D. Cal.) ............................................... 23

*The Authors Guild, Inc. v. Google, Inc.,* No. 05-CV-8136 (S.D.N.Y. 2010) ............................... 23

*Thomas v. Taco Bell Corp.,*
    No. 09-01097-CJC, 2012 WL 3047351 (C.D. Cal. June 25, 2012) ................................. 14

*True v. Am. Honda Motor Co.,* 749 F. Supp. 2d 1052 (C.D. Cal. 2010) ........................ 24, 25, 32

*White v. Experian Info. Solutions, Inc.,* 803 F. Supp. 2d 1086 (C.D. Cal. 2011) ...................... 29

*Yeagley v. Wells Fargo & Company,*
    No. C05-03403 CRB, 2008 WL 171083 (N.D. Cal. Jan. 18, 2008) ................................ 24

*Young v. Polo Retail, LLC,*
    No. C-02-4546 VRW, 2007 WL 951821 (N.D. Cal. March 28, 2007) ................ 19, 24, 25

**Statutes**

Fed. R. Civ. P. 23 .................................................................................................... *passim*

11 U.S.C. §§ 506, 507 ................................................................................................... 29

28 U.S.C. § 1712, *et seq.* .............................................................................................. 25

28 U.S.C. § 1715, *et seq.* .............................................................................................. 22

47 U.S.C. § 227, *et seq.* ........................................................................................... *passim*

**Miscellaneous:**

Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* (4th ed. 2002) ...................... 9, 12

*Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist
    and Plain Language Guide* (2010) ...............................................................................9-10

H.R. 3035, *Mobile Informational Call Act of 2011*, 112th Cong. (2011) .................................... 31

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,*
    27 F.C.C.R. 1830 (2012) ............................................................................................. 13

## I.   INTRODUCTION

Everyday, consumers nationwide are subjected to a barrage of advertisements and solicitations, some specifically targeted to reflect an individual's spending habits, others randomly distributed in the hopes of casting the widest net possible.  Advertisers have become quick to capitalize on the latest technological advances in order to develop newer and faster means to distribute their messages, though often failing to consider the consent of the consumer to receive them.  One burgeoning method is the use of text messages, or "SMS" marketing, which allows businesses to send short text messages to the cellular phones of consumers, often without the consumer's authorization.  In fact a recent study indicates that 69% of consumers have been the recipients of an unsolicited text message advertisement at some point.[1]

The litigation and instant Settlement Agreement (as amended, the "Settlement Agreement," attached hereto as Exhibit 1) before the Court represent an attempt to stem the tide of unsolicited text messages, and involve allegations that Heartland Automotive Services, Inc. ("Heartland," the largest Jiffy Lube franchisee in the nation) and marketer TextMarks Inc. ("TextMarks") (together, the "Defendants"), violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA"), when they caused the transmission of allegedly unsolicited text messages promoting Heartland's "e-club" to over 2.3 million consumers' cellular phones.  The negative reaction to this campaign was immediate: in the month that followed, six separate Plaintiffs filed suit in multiple federal district courts alleging that Defendants violated the TCPA.  Recognizing the need for uniformity over these claims, the Judicial Panel on Multidistrict Litigation ("JPML") consolidated these cases in this Court for further proceedings.

Now, following over a year and a half of litigation, including the briefing, argument and denial of Heartland's motions to dismiss and to compel arbitration, as well as multiple rounds of arms' length negotiations conducted with the assistance of this Court and the Honorable

---

[1] A recent study by the Pew Research Center found that 69% of cell phone owners receive unwanted or spam text messages, with 25% of such users receiving spam text messages on at least a weekly basis.  *See* http://www.pewinternet.org/Reports/2012/Mobile-phone-problems/Main-findings/Mobile-phone-problems.aspx.

1 | Magistrate Judge Jan M. Adler, the Parties have reached the instant Settlement Agreement for

2 | which they now seek final approval pursuant to Federal Rule of Civil Procedure 23(e).

3 |         The Settlement represents one of the largest TCPA text message settlements in history and

4 | a significant victory for consumers nationwide.  First, the Settlement provides uncompromising

5 | injunctive relief aimed at stopping the very conduct complained of, by requiring Defendants to

6 | obtain the consent of any future text message recipients in writing before sending them any text

7 | message advertisements.  Even more impressive is the value of the monetary and goods/services

8 | relief obtained for the class.  Defendants will automatically send a Certificate good for up to $20

9 | off all Jiffy Lube products and services, redeemable for up to 18 months from final approval of the

10 | Settlement, to every identifiable Class Member who received the text message at issue—of which

11 | there are over 2.3 million.  For those Class Members who prefer cash, the Certificates can also be

12 | redeemed for up to $15 following the expiration period of the goods/services value of the

13 | Certificate.  (*See* Section III *infra* for a more detailed description of the Certificate value and

14 | relief.)  The total value of the goods/services portion of the Certificate is worth $46,844,780.00,

15 | and the cash redemption value is $35,133,585.00.

16 |         On October 10, 2012—after supplemental briefing and modifications to the Notice Plan at

17 | the Court's suggestion—the Court granted preliminary approval of the Settlement (Dkt. 85, ¶ 1),

18 | finding that the broad Notice Plan set forth in the Settlement "satisfies due process requirements,

19 | is the best notice practicable under the circumstances, and shall constitute due and sufficient notice

20 | to all Class Members."  (*Id.* at ¶ 8.)  The Settlement Administrator has successfully implemented

21 | the Notice Plan, and the deadline for submitting requests for exclusion and objections has now

22 | passed.  There has been an overwhelmingly favorable reaction to the Settlement, with only 132

23 | (.006%) members of the Class "opting-out" and only five class members who raised objections

24 | (.0002%).  Considering the automatic relief provided to Class Members (there is no claims process

25 | required to receive the Certificate), and the value of the Certificates both as a means to purchase

26 | products or services, or to redeem as cash, it is no surprise that the response has been so favorable.

27 |         The results achieved by the Settlement Agreement are exceptional, as the relief made

28 | available to the class, the support of all counsel involved in the MDL, the *de minimis* number of

MEMORANDUM ISO MOTION FOR FINAL APPROVAL OF        2        CASE NO. 3:11-MD-02261-JM-JMA
CLASS ACTION SETTLEMENT

1  objections, and inherent risk attendant in continued litigation all favor final approval.

2  Accordingly, Plaintiffs respectfully request that this Court grant final approval of the Agreement

3  and dismiss the Released Claims with prejudice.

4  **II.    NATURE OF THE LITIGATION**

5      **A.    The Facts, the Law, and the Litigation History**

6      The Settlement Agreement[2] presently before the Court seeks to finally resolve litigation

7  that has spawned multiple lawsuits, spanning multiple districts, before finally being consolidated

8  before this Court.  Despite the somewhat sinuous route the multiple suits took before arriving at

9  the instant Settlement, the facts giving rise to the instant action are straightforward: On or around

10  April 21, 2011, each of the Plaintiffs and putative class members received a text message from the

11  SMS Short codes "72345" and "41411" that stated:

12              JIFFY LUBE CUSTOMERS 1 TIME OFFER:
            REPLY Y TO JOIN OUR ECLUB FOR 45% OFF A

13              SIGNATURE SERVICE OIL CHANGE! STOP TO UNSUB
            MSG&DATA RATES MAY APPLY T&C: JIFFYTOS.COM

14  In an attempt to promote its Jiffy Lube "signature oil changes" and encourage Jiffy Lube patrons

15  to join its "EClub," Heartland had enlisted the help of TextMarks to effectuate the transmission of

16  more than 2.3 million text messages to the cellular phones of persons nationwide.

17      The immediate response of consumers in the wake of Defendants' text message campaign

18  was overwhelmingly negative, as consumers flocked to online message boards to voice their

19  displeasure, posting comments such as:

20      •  "Jiffy Lube SMS spam. Nice one. Just lost a customer."

21      •  "Whoever at Jiffy Lube approved this should be fired on the spot . . . You don't send
       unsolicited texts to your customers. You just don't."

22      •  "Lost a Jiffy Lube customer for life . . . Went to textmarks.com too to opt-out of
       future texts from all of their 'services'."

23  (*See* http://www.smswatchdog.com/text-message-from/72345).

24      Moreover, within a month of the transmission of the text message at issue, Plaintiffs

25

26  _____

27     [2] Capitalized terms retain the same definitions as set forth in Section 1 ("Definitions") of the

28  Settlement Agreement.

1   Crowl, Cushnie, Duoung, Heuscher, Koeller, and Souder initiated class actions against Defendants

2   in the United States District Courts for the Southern District of California, the Northern District of

3   California, and the Western District of Washington. All six Plaintiffs alleged that Defendants'

4   conduct violated Section 227(b)(1)(A)(iii) of the TCPA. Plaintiffs further alleged that Defendants

5   effectuated this text message marketing by using SMS short code and related autodialing

6   technology to transmit the above text message *en masse* without the need for human intervention,

7   and without first obtaining the express consent of either the Plaintiffs or the putative class

8   members to receive these messages in direct violation of the TCPA.

9        The TCPA came into existence when Congress recognized the need to combat the

10  pervasive threat of automated telemarketing practices. After much research and deliberation,

11  Congress made it "unlawful to make any call . . . using any automatic telephone dialing system . . .

12  to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. §

13  227(b)(1)(A)(iii); *Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740, 744 (2012). The TCPA was

14  drafted to evolve with emerging technology and applies with equal force to the automated sending

15  of unsolicited text messages as well. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th

16  Cir. 2009); *Lozano v. Twentieth Century Fox*, 702 F. Supp. 2d 999, 1009 (N.D. Ill. 2010).

17  Violators of this law are subject to a statutory penalty of $500 per violation, as well as an

18  injunction prohibiting any future transmission of such messages. 47 U.S.C. § 227(b)(3)(A-B).

19       Recognizing the nearly identical allegations of the multiple actions, on August 8, 2011, the

20  JPML consolidated the cases and transferred them to this Court for coordinated proceedings.[3]

21  (Dkt. 1.) With consolidation complete, the Plaintiffs, having already self-organized, filed a single,

22  Consolidated Complaint seeking an injunction that required Defendants to cease the transmission

23  of unauthorized text messages, as well as an award of the greater of actual or statutory damages

24  pursuant to the TCPA. (*See* Dkt. 7.) In response, on October 26, 2011, Defendant TextMarks

25

26  _____

27  [3] On June 8, 2012, a seventh action, filed by Jacob Barr in Washington State Superior Court
    and removed to the Western District of Washington, was transferred by the JPML into this MDL.

28

1    answered the Complaint, while Defendant Heartland filed both a Motion to Compel Arbitration, as

2    well as a forty-page Motion to Dismiss.  (Dkts. 13, 14, & 16.)  Heartland pursued multiple

3    defenses to liability, arguing that Plaintiffs had failed to state a claim under the TCPA, that

4    Plaintiffs had consented to receiving the text messages by providing their telephone numbers when

5    they brought their cars in for service at a Jiffy Lube, and that the imposition of TCPA liability on

6    Heartland would violate its rights under the First and Fifth Amendments (Dkt. 16.)  The

7    Constitutional challenge to the TCPA necessitated the notification of, and subsequent intervention

8    by the United States Department of Justice who submitted a brief in support of the

9    constitutionality of the TCPA.  (Dkt. 45.)  Having entertained both extensive briefing and oral

10   arguments, the Court denied both of Heartland's motions, resulting in an appeal of the Order

11   refusing to compel arbitration, which is currently pending before the Ninth Circuit.  (Dkt. 54.)

12       **B.      The Mediation and Settlement Agreement**

13           In the wake of the denial of both motions, but prior to the opening of formal discovery, the

14   parties were ordered to attend an Early Neutral Evaluation presided over by the Honorable

15   Magistrate Judge Jan M. Adler.  (Dkts. 37, 55.)  Hoping to facilitate a meaningful and open

16   discussion of their claims, Plaintiffs requested, and Heartland agreed to provide, informal and

17   confidential discovery materials that would shed light on the potential scope of the proposed

18   Class, as well as information concerning the text message campaign itself.  (*See* Declaration of Jay

19   Edelson ¶ 9, a true and accurate copy of which is attached as Exhibit 2.)  In addition, Heartland

20   provided documents and information describing its current financial condition, including its ability

21   to satisfy a judgment or fund a settlement.  (*Id.*)  With these documents in hand, Class Counsel,

22   along with representatives of Defendants and their Counsel, met with Judge Adler, who conducted

23   the conference in the format of a mediation and aided the parties in reaching the basic terms of

24   what would eventually become the instant Settlement Agreement.  (Edelson Decl. ¶¶ 9-12.)

25           The negotiations began with Judge Adler rejecting Heartland's proposal to discuss a

26   "coupon" based settlement while also recognizing that the Defendants' financial situation equally

27   made impossible the creation of a meaningful pure cash deal.  (Edelson Decl. ¶ 11.)  The

28   compromise brokered by Judge Adler recognized that, while certain things were not possible, any

1   Settlement would need to provide both injunctive and monetary relief in order to provide adequate

2   and reasonable relief to the class.  (*Id.*)  The injunction would ensure that Defendants obtained

3   prior express consent in writing before conducting any future text message marketing, and the

4   monetary component would take the form of a Certificate redeemable for a defined set of Jiffy

5   Lube products or services up to $20, that could later be converted to up to $15 in cash.  (Edelson

6   Decl. ¶ 12.)  The Parties persevered through a full day of arms' length negotiations to reach these

7   terms, and even though certain particulars remained unresolved, the Parties agreed to continue

8   settlement discussions and return for further sessions with Judge Adler if necessary.  (*Id.*)

9          The Parties continued negotiating over several telephonic discussions, and exchanged

10  numerous edits to the Settlement Agreement and its exhibits.  (Edelson Decl. ¶ 13.)  The Parties

11  also attended additional status calls with Judge Adler on May 15, 2012 and July 26, 2012, to keep

12  the Court abreast of the settlement talks and to aid in the resolution of remaining issues.  (Edelson

13  Decl. ¶ 14.)  Only after finally reaching agreement as to all of the relief to be provided to the class

14  did the Parties negotiate the incentive awards and attorneys' fees.  (Edelson Decl. ¶ 15.)  The

15  attorneys' fees themselves were a reflection of the strength of the relief, as Class Counsel agreed

16  to accept their fee as a percentage of the total value of the Certificates being sent to the Class.

17  (*Id.*)  The ultimate result of these negotiations is relief to over 2.3 million Class Members in the

18  form of automatically distributed Certificates with a goods/services value of over $46 million, and

19  a cash value of over $35 million, while eradicating the alleged conduct through an injunction.

20         Confident in the strength of the Settlement, the Parties submitted it to the Court for

21  preliminary approval.  (Dkts. 76 & 79.)  On October 10, 2012, this Court preliminarily approved

22  the settlement, certifying the Class, appointing Class Counsel, approving the Notice Plan and

23  terms of the Settlement, including a finding that the cash and goods/services value of the

24  Certificates "fell within the range of reasonableness of a settlement that could ultimately be given

25  final approval by this court," and were thus fair, reasonable and adequate.  (Dkt. 85, ¶ 6.)

26  Pursuant to the Court's Order, and in accordance with the terms of the Settlement, the Parties and

27  Settlement Administrator notified Class Members of the Settlement and fielded inquiries about the

28  Action and Settlement.  (Dkt. 85, ¶¶ 8-9; Edelson Decl. ¶ 16.)  Having separately petitioned for

1  approval of attorneys' fees and incentive awards ahead of the deadline for Class Members to

2  object to the Settlement in accordance with *In re Mercury Interactive Corp.,* 618 F.3d 988 (9th

3  Cir. 2010), (Dkt. 86), Plaintiffs now seek final approval of the Settlement.

4  **III.    THE TERMS OF THE SETTLEMENT AGREEMENT**

5          The terms of the Settlement preliminary approved by the Court are set forth in the

6  Settlement Agreement attached hereto as Exhibit 1 and briefly summarized as follows:

7      **A.    Class Definition**

8          At preliminary approval the Court certified a narrowly defined Settlement Class comprised

9  of all persons or entities in the United States and its Territories who in April 2011 were sent the

10 text message promoting Jiffy Lube from short codes 72345 or 41411, as set forth in Section II(A)

11 above. (Dkt. 85; *See* Ex. 1, § 1.32.)

12     **B.    Class Injunctive Relief**

13         Defendants have consented to the entry of an injunction prohibiting them from sending or

14 directing the sending of any commercial text message unless each potential text message recipient

15 has given explicit prior express consent to receive such messages in writing.  Any method of

16 obtaining consent must contain a clear and conspicuous disclosure that the individual agrees to

17 receive text messages from Heartland and its related entities.  Defendants must maintain

18 documented proof of any consent received for two years thereafter.  (Ex. 1, § 2.1.)

19     **C.    Individual Class Member Relief**

20         Heartland has agreed to provide each member of the Class a Certificate with an aggregate

21 goods/services value of $46,844,780.00, and a cash redemption value of $35,133,585.00.  Should

22 the Court grant final approval to Settlement, each Class Member will automatically be mailed a

23 Certificate that can be redeemed in two ways, subject to certain terms and conditions.  First, the

24 Certificate may be redeemed for 18 months at any Heartland-owned Jiffy Lube store for a defined

25 list of goods or services regardless of price and, inclusive of any sales tax, disposal fees, or

26 service-related costs, including: PCV Valve Replacement, Radiator Cap Replacement, Mini Light

27

28

1   Bulb Replacement, and Aquapel Windshield Treatment.[4]  The Certificate may also be redeemed

2   for up to $20 off <u>any</u> goods or services at Heartland owned Jiffy Lube stores (which will be worth

3   $17.29 if the Court approves the agreed-upon fees), and may also be used in connection with Jiffy

4   Lube's "Early Bird" oil change promotional offer—a popular recurring promotion.  Class

5   Members who do not wish to redeem their Certificates for services may redeem each unused

6   Certificate at the conclusion of the 18-month period for up to a $15 cash payment (which will be

7   $12.97 if the Court approves the agreed-upon fees).  Certificates can be redeemed on-line or by

8   filling out the Certificate and mailing it to a designated address.  In addition, the Certificates are

9   freely transferrable and thus can be traded on the open market.[5]  (Ex. 1, § 2.3(a).)

10        **D.    Other Relief**

11        In addition to the individual and injunctive relief discussed above, the Defendants have

12   agreed to the following relief:

13        **1.    *Payment of notice and administrative fees*:** Defendants agreed to and have

14   paid the full costs of: mailing the settlement class notice; administration of the Settlement; and,

15   should the Court grant final approval, of mailing Class Members the Certificates.

16        **2.    *Compensation for the class representatives*:** In addition to any award under

17   the Settlement, and in recognition of their time and effort on behalf of the proposed Settlement

18   Class, Heartland has agreed to provide each Class Representative an incentive award in the

19   amount of 386 Certificates, with the equivalent cash value of $5,000, subject to the Court's

20   approval.  Defendants have agreed that such an award to the Class Representatives is reasonable

21   and that they will not oppose such an award either directly or indirectly.  (Ex. 1, § 9.5.)

22        **3.    *Payment of attorneys' fees and expenses*:**  Under the Settlement and

23   subject to Court approval, the fees and costs will be provided to proposed Class Counsel in the

24   _____

25        [4] In most instances, the Certificate will also cover the full cost of Windshield Rock Chip
26   Repair Service, Windshield Repair - 2nd Chip, Wiper Blade Refill / Replace, Registration
     Renewal, Safety / Brake Check, Safety Check, Motorcycle Inspection, and Emission Inspection.
27        [5] The Settlement Agreement and Certificates provide that each Certificate can be transferred
     once.  (Ex. 1, § 2.3(a).)
28

1  form of up to 366,300 of the same Certificates being issued to the Class (with a cash equivalent of

2  $4,750,000, representing approximately 13.51 percent of the cash value made available to the

3  class).  Defendants agree that such an award to Class Counsel is reasonable, and that they will not

4  oppose such an award either directly or indirectly.  (Ex. 1, § 9.1.)  On November 19, 2012,

5  Plaintiffs filed with the Court, and posted on the settlement website, their Motion for Approval of

6  Attorneys' Fees and Expenses and Class Representative Incentive Awards.  (Dkt. 86.)

7       **E.**    **Release**

8       In exchange for the relief provided above, and upon the entry of a final order approving

9  this Settlement, Defendants and each of their related affiliates and entities will be released from

10  any claims, whether known or unknown, arising out of or relating to Heartland's or TextMark's

11  involvement in the transmission of any unauthorized text messages from Short Code 72345 or

12  41411.  (*See* Ex. 1, §§ 3, 1.25-1.27 for the full release language.)

13  **IV.**    **THE IMPLEMENTED NOTICE PLAN COMPORTS WITH DUE PROCESS**

14       Before the Court may grant final approval of a settlement, Fed.R.Civ.P. 23(c)(2) requires

15  that the Court determine that the settlement provides the class with the "best notice practicable

16  under the circumstances including individual notice to all members who can be identified through

17  reasonable effort."  Fed.R.Civ.P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156,

18  173 (1974).  Notice is satisfactory where it "generally describes the terms of the settlement in

19  sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be

20  heard."  *Mendoza v. Tucson Sch. Dist. No. 1,* 623 F.2d 1338, 1352 (9th Cir.1980); *see also* Alba

21  Conte & Herbert B. Newberg, *Newberg on Class Actions* § 11:53 at 167 (4th ed. 2002) (notice is

22  "adequate if it may be understood by the average class member.")  Adequate notice sets forth the

23  nature of the action, defines the class to be certified, the class claims and defenses at issue, while

24  also explaining to class members that they may enter an appearance through counsel if so desired,

25  request exclusion from the settlement class, and that any judgment will be binding on all class

26  members.  *See* Fed. R. Civ. P. 23 (c)(2)(B).  Ultimately, the Federal Judicial Center has concluded

27  that a notice plan that reaches at least 70% of the class is reasonable.  *Federal Judicial Center,*

28

1  *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010), p.

2  3. The Parties have strictly adhered to these requirements in directing notice to Class Members.

3        After addressing comments made by the Court during the preliminary approval process,

4  the Parties slightly modified the Notice Plan, which the Court approved as to form and content,

5  recognizing that it "satisfies due process requirements, is the best notice practicable under the

6  circumstances, and shall construe due and sufficient notice to all Class Members." (Dkt. 85, ¶ 8.)

7  The Parties and Settlement Administrator Epiq Class Action & Claims Solutions ("Epiq"), in

8  conjunction with direct-mail program administrator Full Circle Solutions ("Full Circle") worked

9  together to effectuate this multipart Notice Plan, including direct mail of a summary postcard

10  notice, website publication notice, in-store displays in each of Heartland's 540 stores directing

11  consumers to the settlement website, and the establishment of a toll-free telephone number for

12  Class Members to call with questions about the Settlement. (*See* Declaration of Cameron R.

13  Azari, ¶¶ 7-15.), a true and accurate copy of which is attached as Exhibit 3.)

14        Upon preliminary approval the Parties implemented the Notice Plan in compliance with

15  Due Process and Rule 23. (Azari Decl. ¶¶ 18-20.) Direct notice of the Settlement was especially

16  successful, utilizing a list assembled by Heartland containing the addresses of 1,961,655 Class

17  Members, or 84% of the class. Prior to mailing, each address was checked against the National

18  Change of Address database and recognized procedures were used to ensure accurate addressing

19  and valid delivery. (Azari Decl. ¶¶ 9-10.) For all postcards returned undeliverable, Epiq

20  performed an additional search and was able to obtain valid address through a LexisNexis

21  database and re-mail over 225,000 Notices. (Azari Decl. ¶¶ 11-12.) Ultimately, direct notice was

22  provided to over 90% of the class for whom addresses were available. (Azari Decl. ¶ 12.)

23        In addition, beginning on October 31, 2012, each of the 540 Heartland Jiffy Lube

24  franchises posted an 8.5" by 11" acrylic summary notice by the counter where patrons of Jiffy

25  Lube, like the members of the Class, check out. (Azari Decl. ¶ 13.) These notices were

26  mandatory and are required to stay posted until February 3, 2013. (*Id.*)

27        All forms of notice referenced the settlement website, www.HeartlandTextSettlement.com,

28  which went live October 19, 2012, and provided toll free numbers for Class Counsel and the

1  Settlement Administrator.  (Azari Decl. ¶¶ 14-15.)  The website contains the full traditional "long

2  form" notice of the Settlement, as well as copies of relevant Court documents including the

3  Settlement Agreement, Orders of the Court, and the Motion to Approve Attorney Fees and Class

4  Representative Incentive Awards. (*Id.*)  The website will also permit Class Members to redeem

5  their Certificates for cash payments online, should the Court grant Final Approval.  (*Id.*)

6          Finally, on August 13, 2012, in compliance with the Class Action Fairness Act, 28 U.S.C.

7  § 1715(b), Defendants' counsel mailed a letter enclosing the requisite court documents to the U.S.

8  Attorney General and the Attorneys General of each state and U.S. territory giving notice of the

9  Settlement.  (*See* Declaration of Glenn M. Kurtz in support of preliminary approval and CAFA

10  notices attached as Exs. A & B, a true and accurate copy of which is attached hereto as Exhibit 4.)

11          Given the content and scope, as well as the percentage of Class Members successfully

12  reached, the Notice Plan fully satisfies both Rule 23 and Due Process.  (Azari Decl. ¶ 18-20.)

13  **V.      THE SETTLEMENT WARRANTS FINAL APPROVAL**

14          "Strong judicial policy [] favors settlements, particularly where complex class action

15  litigation is concerned."  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).

16  Even still, Rule 23(e) provides that "[a] class action shall not be dismissed or compromised

17  without the approval of the court . . . ."  Fed.R.Civ.P. 23(e).  Before it may grant approval, the

18  Court must first determine whether the proposed class action settlement is fundamentally fair,

19  adequate, and reasonable.  *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir.

20  1982), *cert. denied,* 459 U.S. 1217 (1983).  In order to evaluate the fairness, reasonableness, and

21  adequacy of a proposed class settlement, courts are instructed to weigh the following non-

22  exhaustive list of factors: "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity,

23  and likely duration of further litigation; (3) the risk of maintaining class action status throughout

24  the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage

25  of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental

26  participant; and (8) the reaction of the class members to the proposed settlement."  *Churchill Vill.,*

27  *L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (citing *Hanlon v. Chrysler Corp.,* 150 F.3d

28  1011, 1026 (9th Cir. 1998)); *see also Lane v. Facebook, Inc.,* 696 F.3d 811, 819 (9th Cir. 2012).

1  No one factor controls, and the "importance to be attached to any particular factor will depend

2  upon ... the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and

3  circumstances presented by each individual case." *Officers for Justice,* 688 F.2d at 625.

4          Ultimately however, while the court has complete discretion to approve or reject a

5  settlement, judges are encouraged to give "proper deference to the private consensual decisions of

6  the parties." *Garner v. State Farm Mut. Auto. Ins. Co.,* CV 08 1365 CW EMC, 2010 WL

7  1687832, *8 (N.D. Cal. Apr. 22, 2010) (citing *Rodriguez v. West Publishing Corp.,* 563 F.3d 948,

8  965 (9th Cir. 2009) ("We put a good deal of stock in the product of arms-length, non-collusive,

9  negotiated resolution. . . .")).  In "the Ninth Circuit, a court affords a presumption of fairness to a

10  settlement, if: (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3)

11  the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction

12  of the class objected." *Lewis v. Starbucks Corp.,* No. 07-cv-00490, 2008 WL 4196690, at *7 (E.D.

13  Cal. Sept. 11, 2008) (citing *Newberg,* § 11:41).  Here, the Settlement should be presumed fair, as

14  the Parties are all represented in this MDL by experienced counsel whose negotiations were

15  conducted through Judge Adler after being provided with sufficient information about the alleged

16  conduct at issue, the number of class members and Defendants' possession of their mailing

17  addresses, and reports detailing Heartland's financial situation.  These facts and the paucity of

18  objections support this presumption of fairness, especially when coupled with the significant

19  results achieved for the Class in the face of both Defendants' willingness to vigorously defend this

20  Action, and the Defendants' financial inability to withstand any significant judgment against them.

21  The Court should find that this Settlement is fair, reasonable and adequate, provides the Plaintiffs

22  and Class Members with automatic relief, and helps avoid the "time, cost, and rigors of formal

23  litigation."  *Martin v. AmeriPride Services, Inc.,* No. 08-CV-440-MMA JMA, 2011 WL 2313604,

24  *6 (S.D. Cal. June 9, 2011).  An analysis of each factor addressed below reinforces the Court's

25  preliminary finding that the Settlement meets these requirements and is worthy of final approval.

26      **A.      The Strength of the Plaintiffs' Case**

27          The first factor courts look to in analyzing the fairness, reasonableness, and adequacy of a

28  settlement is the strength of the plaintiff's case and the range of possible recovery in light of the

1   risks of continued litigation.  This calls for balancing "the vagaries of litigation and [] the

2   significance of immediate recovery by way of the compromise to the mere possibility of relief in

3   the future, after protracted and expensive litigation." *Shames v. Hertz Corp.*, No. 07-CV-2174-

4   MMA WMC, 2012 WL 5392159, *5 (S.D. Cal. Nov. 5, 2012); *see also Protective Comm. for*

5   *Indep. Stockholders v. Anderson*, 390 U.S. 414, 424–25 (1968) ("Basic to [analyzing a proposed

6   settlement] in every instance, of course, is the need to compare the terms of the compromise with

7   the likely rewards of the litigation.")  In other words, courts should determine "whether the

8   decision to settle is a good value for a relatively weak case or a sell-out of an extraordinarily

9   strong case." *Martin*, 2011 WL 2313604, at *6.

10          First, Plaintiffs and Class Counsel believe their claims to be strong, and are confident that

11  if the case were to proceed to summary judgment or to a trial, they would likely succeed on the

12  merits.  (Edelson Decl. ¶ 19.)  The TCPA provides for $500 in damages for each violation, setting

13  the statutory cap on the maximum for potential recovery for the class at over a billion dollars.  *See*

14  47 U.S.C. § 227(b)(3)(B).  Second, the Court has already ruled against Heartland's motions to

15  dismiss the Complaint and to compel arbitration, including the rejection of its challenge to the

16  constitutionality of the TCPA as both impermissibly vague and a restriction on protected speech.

17  (Dkt. ¶54.)[6]  Moreover, a growing body of precedent indicates that Plaintiffs would ultimately

18  succeed in both adversarial class certification and trial.  *See e.g. In the Matter of Rules &*

19  *Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C.R. 1830 (2012)*, Agne v.*

20  *Papa John's Int'l, Inc.*, C10-1139-JCC, 2012 WL 5473719 (W.D. Wash. Nov. 9, 2012) (certifying

21  both a national and state subclass in TCPA text message action); *Griffith v. Consumer Portfolio*

22  *Serv., Inc.*, 838 F. Supp. 2d 723, 727 (N.D. Ill. 2011).

23

24  ───────────────

25          [6] The Court's decision is in line with other Courts that have upheld the Constitutionality of the
    TCPA against similar arguments. *See e.g. Abbas v Selling Source, LLC*, No. 09 CV 3413, 2009
26  WL 4884471, at *1 (N.D. Ill. 2009) (finding TCPA as applied to text messages does not violate
    First Amendment); *Satterfield*, 569 F.3d at 952 (finding a text message to be a "call" under the
27  TCPA); *Kramer v. Autobytel, Inc*, 759 F. Supp. 2d. 1165, 1171 (N.D. Cal. 2010) (rejecting
    vagueness challenge to TCPA text messaging case).
28

1    However, Heartland has repeatedly indicated to Class Counsel and the Court that it

2    believes it would ultimately prevail on one or all of the following arguments: (1) that the

3    equipment used to send the text messages does not fall under the statutory definition of an

4    "automatic telephone dialing machine," because it claims the equipment did not have the capacity

5    to randomly or sequentially generate numbers to be called; (2) Heartland cannot be liable because

6    it did not transmit the messages itself, it hired TextMarks to do so; (3) that because Plaintiffs gave

7    Heartland their cell phone numbers while visiting Heartland-owned Jiffy Lube stores they

8    consented to receive the text messages at issue; and (4) that this "prior express consent" provided

9    by the Plaintiffs is an individualized issue that makes class action treatment inappropriate.  Before

10   even reaching these issues, Plaintiffs would need to defeat Heartland's pending Ninth Circuit

11   appeal regarding the enforceability of the arbitration clause signed by one of the named Plaintiffs

12   and many class members.  Some judicial authority exists supporting these arguments.  *Ibey v.*

13   *Taco Bell Corp.*, No. 12-CV-0583-H WVG, 2012 WL 2401972, *3 (S.D. Cal. June 18, 2012)

14   (dismissing claim based on plaintiff's failure to allege or prove that defendant used a dialer with

15   capacity to store or dial random or sequential numbers); *Thomas v. Taco Bell Corp.*, No. 09-

16   01097-CJC, 2012 WL 3047351, *4 (C.D. Cal. June 25, 2012) (declining to extend the TCPA to

17   include liability for entity on whose "behalf" text message was sent without establishing

18   traditional agency relationship); *Gene and Gene, LLC v. Biopay LLC,* 541 F.3d 318, 327 (5th Cir.

19   2008) (stating that the predominant issue in a TCPA case "is undoubtedly one of *individual*

20   consent"); *McNamara v. Royal Bank of Scotland Group, PLC*, No. 11-CV-2137-L WVG, 2012

21   WL 5392181 (S.D. Cal. Nov. 5, 2012) (granting defendant's motion to compel arbitration in

22   TCPA class action).  Several of these issues are untested in the Ninth Circuit, introducing another

23   layer of uncertainty to the ultimate success of Plaintiffs' case.

24       Yet even still (and as explained in greater detail in the following section), given the

25   complexity of the issues still to be litigated and the very real potential that Defendants may

26   succeed on any of the above-referenced issues on either a motion for summary judgment or at

27   trial—depriving the Plaintiffs and Class of any relief whatsoever—the instant Settlement was

28   anything but a "sell-out." Quite the opposite, Plaintiffs recognized that even after overcoming the

1  hurdles of both a motion to dismiss and motion to compel arbitration, issues of class certification

2  as well as summary judgment still present a significant hurdle, one that could only be truly

3  avoided through a compromise that would benefit both the Plaintiffs and Class, as well as the

4  Defendants. *See Bellows v. NCO Fin. Sys., Inc.*, No. 07-CV-01413-W-AJB, 2008 WL 5458986,

5  *7 (S.D. Cal. Dec. 10, 2008) (noting that "the very essence of a settlement agreement is

6  compromise, a yielding of absolutes and an abandoning of highest hopes . . . in exchange for the

7  saving of cost and elimination of risk, the parties each give up something they might have won

8  had they proceeded with litigation.") Plaintiffs recognize the inherent risk in any litigation, much

9  less a class action of this size and magnitude, and are thus satisfied that the proposed Settlement

10  reflects the strength of their claims without risking a judgment leaving the Class without any

11  relief. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004)

12  ("It has been held proper to take the bird in hand instead of a prospective flock in the bush.")

13  Thus, given the strength of Plaintiffs' claims, the Court should find this factor satisfied.

14      **B.**     **The Risk, Expense, Complexity, and Likely Duration of Further Litigation**

15      Where a settlement would help to avoid continued litigation that would delay or deprive

16  the class of relief, and would "save [] the time, expense, and inevitable risk of litigation," courts

17  typically find this factor satisfied. *Officers for Justice*, 688 F.2d at 624; *see also Rodriguez,* 563

18  F.3d at 966 (favoring settlement and finding this factor satisfied where "[i]nevitable appeals would

19  likely prolong the litigation, and any recovery by class members, for years"); *Shames*, 2012 WL

20  5392159, at *6 (finding that where plaintiffs faced "significant uncertainty and risk of

21  nonrecovery at trial," pre-trial settlement was "a reasonable tactical choice.")

22      Heartland has indicated that absent a settlement agreement it would vigorously pursue the

23  above-mentioned claims and defenses. (Edelson Decl. ¶ 21.) Considering the complexity of the

24  case, the amount in controversy, and the stage of the proceedings, it is almost certain that the

25  Parties would invest substantial labor and expenses on a motion for summary judgment, expert

26  witness discovery, and the briefing and arguing of a number of pre-trial motions and evidentiary

27  motions. (Edelson Decl. ¶ 22.) Further, a full trial on this issue would be expensive for both

28  parties, requiring months of preparation and the calling of witness and experts from across the

1    country. (*Id.*) Undoubtedly, with the potential for statutory damages totaling over a billion

2    dollars, the losing party would absolutely appeal the decision, resulting in the expenditure of even

3    more time and money. (*Id.*) With these expenses still to come, and the inherent risk involved in

4    any continued litigation, the Court should find that the Settlement militates in favor of this factor.

5           **C.      The Risk of Maintaining Class Action Status Throughout the Trial**

6           Similar to the risk inherent in pursuing the merits of the case, is the risk of certifying and

7    then maintaining class status throughout the litigation. This risk is not exclusive however to

8    instances where a plaintiff has already managed to successfully move for class certification prior

9    to settlement. In fact, courts will still consider this factor even where a settlement is reached prior

10   to class certification, given that pre-certification concerns validate the risk both parties faced

11   should a Plaintiff succeed or fail in certifying the class. *See Gardner v. GC Services, LP,* No. 10-

12   CV-0997-IEG CAB, 2012 WL 1119534, *4 (S.D. Cal. Apr. 2, 2012) (recognizing the risk class

13   certification poses for both parties and acknowledging the benefits of settlement prior thereto).

14          The Court's October 10, 2012 Order certified a nationwide class for settlement purposes

15   only. (Dkt. 85.) Were litigation to continue, certification would dissolve and the Parties would

16   face a motion for class certification. For the Plaintiffs, failure to certify a class would mean the

17   end of their action, foreclosing any recovery for proposed class members, and eviscerating the

18   Class Action. As noted above, although the weight of authority favors the certification of TCPA

19   class actions under similar facts, *Agne*, 2012 WL 5473719, at *13, denial of adversarial class

20   certification remained a possibility. *See Kenro, Inc. v. Fax Daily, Inc.,* 962 F. Supp. 1162, 1169-

21   70 (S.D. Ind. 1997). Given the certification risk both sides faced, the Court should find the

22   decision to settle prior to class certification reasonable and supporting the fairness of the

23   Settlement Agreement.

24          **D.      The Amount Offered in Settlement**

25          To determine whether the overall settlement amount negotiated by the parties is fair,

26   reasonable, and adequate, courts may compare the settlement amount to the parties' estimates of

27   the maximum amount of damages that would be recovered if the action were successfully litigated

28   at trial. *Martin*, 2011 WL 2313604, at *6. While the total amount offered, measured against the

1  potential recovery the class might have received as the result of a full trial on the merits is relevant

2  "[t]his circuit has long deferred to the private consensual decision of the parties." *Rodriguez*, 563

3  F.3d at 965. Where the settlement is the result of "an arms-length, non-collusive, negotiated

4  resolution," courts "put a good deal of stock" in the agreement reached by the Parties. *Id.* (citing

5  *Hanlon,* 150 F.3d at 1027). This is because courts recognize that "[i]n reality, parties, counsel,

6  mediators, and district judges naturally arrive at a reasonable range for settlement by considering

7  the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of

8  obtaining it, discounted to present value." *Id.* Specifically, in cases involving statutory damages,

9  the court is not required to find "a specific monetary value corresponding to each of the plaintiff

10  class's statutory claims and compare the value of those claims to the proffered settlement award,"

11  as this is a question of fact that must be proven at trial. *Lane*, 696 F.3d at 823. Here, the instant

12  settlement amount negotiated for the class—one of the largest in the history of TCPA text

13  settlements—weighs heavily in favor of finding this factor satisfied.

14        As detailed in § V(A) *supra*, Defendants faced the possibility of statutory damages in the

15  amount of $1,171,119,500 for their alleged violations of the TCPA. From the outset, as a result of

16  both their own investigations, communications, and exchange of evidence with Defendants,

17  Plaintiffs researched the extent to which either Defendant was able to satisfy any substantial

18  judgment (or fund any substantial settlement fund) in the event the case were to proceed to trial.[7]

19  (Edelson Decl. ¶ 9.) This knowledge played a significant role in the negotiations with Judge Adler

20  and in determining the structure of the Settlement, and is a factor that courts consider in

21  determining the ultimate value of the proposed settlement. *See Laguna v. Coverall N. Am., Inc.*,

22  No. 09-CV-02131-JM BGS, 2012 WL 607622, *3 (S.D. Cal. Feb. 23, 2012) (approving a

23  _____

24     [7] Evidence produced by Heartland indicated it spent a year in Chapter 11 bankruptcy,
   emerging in January 2009 and still operates at a loss with minimal cash on its balance sheet. (Dkt.

25  79-2, ¶¶ 16-20). Heartland also identified $217 million in secured debt (*id.*), which would have

26  priority over any judgment that Plaintiffs obtained, and provided evidence that the oil change
   service industry is troubled and has been significantly affected by the economic downturn, with

27  consumers waiting longer to change their oil and increasingly performing the service themselves
   and with a number of bankruptcy filings in the industry. (*Id.*)

28

1   settlement in which "[p]laintiffs' concern over [defendant]'s ability to pay seems to have played a

2   large role in driving the settlement."); *see also In re Wireless Tele. Fed. Cost Recovery Fees Litig.*,

3   396 F.3d 922, 932-33 (8th Cir. 2005) (mandating the consideration of a defendant's financial

4   condition when evaluating the value of a class action settlement agreement). Still, Plaintiffs were

5   adamant about structuring and negotiating a Settlement that would provide significant monetary

6   and injunctive relief to the class, despite Defendants' financial limitations. (Edelson Decl. ¶ 11.)

7         To that extent, the Settlement negotiated by the Parties still impacts a significant amount of

8   Defendants' available finances. It provides each Class Member for whom Heartland has a mailing

9   address a Certificate, with an aggregate goods/services value of $46,844,780.00, and an aggregate

10   cash redemption value of $35,133,585.00.[8] Further, Class Members will receive their Certificates

11   automatically in the mail, eliminating any claims process and increasing the likelihood of use.

12   Upon final approval, Class Members can redeem the Certificate for 18 months at any Heartland

13   Jiffy Lube store for a defined list of goods or services, inclusive of sales tax, disposal fees, or

14   service-related costs, including: PCV Valve Replacement, Radiator Cap Replacement, Mini Light

15   Bulb Replacement, and Aquapel Windshield Treatment.[9] The Certificate may also be redeemed

16   for up to $20 off any goods or services at Heartland Jiffy Lube stores (which will be worth $17.29

17   if the Court approves the agreed-upon attorneys' fees), or can be used in connection with Jiffy

18   Lube's "Early Bird" oil change offer. For those who prefer cash, Class Members can redeem their

19   Certificates online or by mail for up to $15 at the conclusion of the 18-month period for a cash

20

21   [8] The cash value of the Certificates is simply the product of the $15 maximum potential cash
redemption (i.e. the cash value if the Court awards zero attorneys' fees, as the Settlement is not

22   contingent on the award of any specific amount of fees) and the total number of Class Members.
If each Class Member gets a Certificate and elects to redeem it for cash, the total benefit to the

23   Class is $35,133,585.00, less fees. The goods/services value is calculated similarly, using the $20
maximum potential redemption value, representing the purchasing power of the Certificates

24   without Class Members contributing funds of their own. (*See* Settlement §§1.4-1.5; 1.37-1.38.)

25   [9] The Certificate will also cover the full cost of Windshield Rock Chip Repair Service,
Windshield Repair - 2nd Chip, Wiper Blade Refill/Replace, Registration Renewal, Safety/Brake

26   Check, Safety Check, Motorcycle Inspection, and Emission Inspection on most cars. Although
Jiffy Lube is recognized more for its oil changes, roughly half of the consumers that visit a

27   Heartland Jiffy lube normally purchase such services, and in over 583,000 visits customers
purchased only these ancillary services. (*See* Dkt. 79, pg. 5.)

28

1    payment (which will be $12.97 if the Court approves the agreed-upon fees). Further adding to

2    their value is the fact that the Certificates are transferable, and can be traded on the open market.

3        Putting aside Defendants' inability to pay a billion dollars, the fact that the settlement

4    amount is significantly less than the maximum exposure does not impugn the adequacy of the

5    settlement. In addition to the uncertainties of continued litigation, the dual nature of the

6    Certificates—redeemable for either services and products or for cash, and transferable—

7    reinforces the value of the Settlement, and is comparable to other settlements approved in this

8    Circuit. *See e.g., Young v. Polo Retail, LLC*, No. C-02-4546 VRW, 2007 WL 951821, *4 (N.D.

9    Cal. Mar. 28, 2007) (final approval granted to settlement consisting of $1 million in cash and

10    $500,000 in gift cards, and noting that transferability of gift cards "enabled class members to

11    obtain cash-something all class members will find useful"); *Kazemi v. Payless Shoesource, Inc. et*

12    *al*, No. CV09-5142 (N.D. Cal. April 2, 2012) (order finally approving settlement in TCPA text

13    messaging case with over $4 billion in potential statutory liability that provided $6 million in

14    transferrable $25 Merchandise Certificates with no cash value to class members).

15        Even without the limitations posed by Defendants' financial condition, the significant

16    goods/services and monetary value of the Settlement would render this factor met. *See e.g. Lane*,

17    696 F.3d at 824 (9th Cir. 2012) (noting that $9.5 million settlement fund would be "substantial

18    under most circumstances"). When viewed through the lens of Defendants' financial condition,

19    the Settlement favors a finding that it is fair, reasonable and adequate even more powerfully.

20        **E.**    **The Extent of Discovery and the Stage of the Proceedings**

21        The next factor considers the extent of discovery conducted and the stage of the litigation

22    as indicators of Class Counsel's familiarity with the case and ability to make informed decisions.

23    *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). In class action settlements,

24    no specific stage of litigation nor quantum of information gleaned from discovery is required to

25    support the decision to settle. Instead, "as long as the parties have sufficient information to make

26    an informed decision about settlement, formal discovery is not a necessary ticket to the bargaining

27    table." *Gardner*, 2012 WL 1119534, at *5 (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d

28    1234, 1239 (9th Cir.1998)). What is required is that the parties reach a point in the litigation

1  where they have "a clear view of the strengths and weaknesses of their cases." *Bellows*, 2008 WL

2  5458986, at *8 (quoting *In re Warner Communications Sec. Litig.*, 618 F.Supp. 735, 745

3  (S.D.N.Y.1985)).  Not only is early settlement favored by the Court, but informal discovery is

4  preferred over vast formal discovery:

> [Courts] have often seen cases which were 'over discovered.' In addition to
> wasting the time of [the] Court, the parties and their attorneys, it often adds
> unnecessarily to the financial burden of litigation and may often serve as a
> vehicle to harass a party. Discovery in its most efficient utilization should be
> totally extra-judicial. . . . Being an extra judicial process, informality in the
> discovery of information is desired.

9  *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005) (quoting *Cotton v.*

10  *Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977).  The Ninth Circuit is in accord, approving

11  settlements without formal discovery.  *See e.g. In re Mego*, 213 F.3d at 459 (approving settlement

12  without extensive formal discovery, but where Class Counsel conducted significant investigation,

13  discovery and research, worked with damages and accounting experts, and presented the Court

14  with documentation in support); *Linney*, 151 F.3d at 1239 (settlement approved where parties had

15  sufficient information, even in the absence of formal discovery, to make an informed decision.)

16      Though here the Parties had yet to engage in formal discovery, each had ample opportunity

17  to obtain information regarding the other's claims and defenses through their investigations and

18  exchange of informal discovery and multiple interactions over the course of this litigation.  Class

19  Counsel also had the benefit of extensive experience in the realm of TCPA litigation from which

20  to make informed decisions about the claims in this case.  (Edelson Decl. ¶¶ 17-18.)  Additionally,

21  both Parties engaged in substantial research and briefing revolving around the issues raised in both

22  Heartland's motions to dismiss and to compel arbitration.  (Dkts. 14, 16, 31, 32, 35, 36.)

23      When the Parties were ordered to attend the ENE Conference in front of Judge Adler, they

24  agreed to exchange substantial informal discovery including information regarding the scope of

25  the proposed Class, information about the text messaging campaign, as well as documents

26  regarding Heartland's financial condition.  (Edelson Decl. ¶ 9.)  At the ENE Conference, the

27  Parties engaged in a day-long, arms' length negotiation during which they discussed at length their

28  respective positions and views on the case.  (Edelson Decl. ¶ 12.)  These discussions continued

1   throughout the following months via telephone and also at status calls with Judge Adler. (Dkts.

2   66, 74.) All of these instances provided the Parties with numerous opportunities to obtain the

3   information necessary to fully understand the facts and merits of the claims and to properly

4   evaluate and structure the best Settlement possible under the circumstances. As such, the Parties

5   had more than sufficient information on hand to evaluate their litigation position, further

6   supporting the reasonableness of the instant Settlement.

7         **F.**     **The Experience and Views of Counsel**

8         Courts consistently rely on the settlements reached by experienced counsel given that

9   "[p]arties represented by competent counsel are better positioned than courts to produce a

10   settlement that fairly reflects each party's expected outcome in litigation." *In re Pac. Enters. Sec.*

11   *Litig.*, 47 F.3d 373, 378 (9th Cir.1995). This presumption is strengthened when class counsel has

12   specific experience in the type of claims being litigated. *See Martin*, 2011 WL 2313604, at *7;

13   *see also Nat'l Rural Telcoms*, 221 F.R.D. at 528 ("[g]reat weight is accorded to the

14   recommendation of counsel, who are most closely acquainted with the facts of the underlying

15   litigation.")

16         Class Counsel specialize in litigating consumer class actions of similar size and complexity

17   and have pioneered the application of the TCPA to text-messaging technology. (Edelson Decl. ¶¶

18   17-18.) They have frequently been appointed lead class counsel by courts throughout the country,

19   and have the resources and experience necessary to conduct litigation of this nature. (*See* Firm

20   Resume of Edelson McGuire LLC, attached to the Edelson Decl. as Exhibit A.) Moreover, the

21   other firms involved in this MDL, each of who support the Settlement, also have significant

22   experience in class action litigation and cases involving the TCPA.

23         While familiar with the issues involved, Class Counsel were pitted against highly-

24   experienced defense counsel from top-tier national defense firms who promised to continue to

25   mount a formidable defense. (Edelson Decl. ¶ 21.) In this litigation, Class Counsel directed this

26   action through the MDL process, organized the ten firms representing Plaintiffs, avoided internal

27   leadership fights, and defeated each of Heartland's arguments for dismissal or forced arbitration.

28   Most importantly, Class Counsel were able reach a valuable settlement to the benefit of each Class

1    Member.  Finally all of the Plaintiffs firms involved in this litigation fully support this Settlement

2    and agree that it presents a more than adequate recovery for the Class.  (Edelson Decl. ¶ 23.)  This

3    factor thus also weighs in favor of final approval of the Settlement.

4        **G.**    **The Presence of a Governmental Participant**

5        One factor the Court may consider in evaluating the fairness of a settlement is "the

6    presence of a governmental participant," *see Hanlon*, 150 F.3d at 1026, which "serves to protect

7    the interest of the class members."  *Glass v. UBS Fin. Services, Inc.*, No. C-06-4068 MMC, 2007

8    WL 221862, *5 (N.D. Cal. Jan. 26, 2007) aff'd, 331 F. App'x 452 (9th Cir. 2009) (quoting

9    *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir.1977)).  Although the United

10   States intervened in this matter, Defendants were obliged to separately notify the U.S. Attorney

11   General and the state Attorneys General of the Settlement under CAFA.  28 U.S.C. § 1715;

12   *Garner*, 2010 WL 1687832, at *14.  And although CAFA does not create an affirmative duty for

13   officials to take any action, "CAFA presumes that, once put on notice, state or federal officials

14   will raise any concerns that they may have during the normal course of the class action settlement

15   procedures."  *Id.*  Defendants timely complied with CAFA's notice requirement, providing the

16   requisite notice on August 13, 2012.  (Ex. 4.)  No state or federal official has raised any objection

17   to the Settlement; this is a factor to be considered as well.  *See Pelletz v. Weyerhaeuser Co.*, 255

18   F.R.D. 537, 543 (W.D. Wash. 2009) ("the Court has considered the fact that no governmental

19   agent has responded to the proposed settlement, despite the class settlement notifications sent to

20   the appropriate federal and state officials.")  Accordingly, this factor too favors the approval of the

21   Settlement.

22       **H.**    **The Reaction of the Class Members to the Proposed Settlement**

23       The Settlement has been very well received by the Settlement Class, only 132 individuals

24   requested exclusion and only four objections were filed—one by a professional objector attorney,

25   one by another attorney, and two by non-attorneys on their own behalf.  This few objections in a

26   class of over two million provides strong evidence of the favorability of the settlement to the class,

27   *see Churchill Vill., L.L.C. v. GE*, 361 F.3d at 577, *In re Mego*, 213 F.3d at 459, and *Hartless v.*

28   *Clorox Co.*, 273 F.R.D. 630, 641 (S.D. Cal. 2011), and does more to point out the strength of the

1   settlement than any weakness.  In addition, none of the objections rests on a valid basis or

2   discharges the objector's burden of proving the assertions raised therein.  *See U.S. v. Oregon*, 913

3   F.2d 576, 581 (9th Cir. 1990) (citing *Moore v. City of San Jose*, 615 F.2d 1265, 1272 (9th Cir.

4   1980) ("In this circuit, we have usually imposed the burden on the party objecting to a class action

5   settlement.")).  For the reasons that follow, all four should be overruled in their entirety.

6         *The Palmer Objection*

7         The only objection from a represented party was filed by notorious serial objector Joseph

8   Darrel Palmer,[10] on behalf of Trent Manbeck and Dallas Stephens (the "Palmer Objection").  It

9

10      [10] Class Counsel does not apply the terms "notorious" or "serial objector" lightly to Mr. Palmer.  Palmer has objected to class action settlements in dozens of cases, several of which have

11  drawn strong rebukes from courts. Palmer has refused to respond to counsel, refused to have his client sit for depositions or produce documents when his motives or standing has been questioned,

12  acted in violation of court orders, acted in violation of local rules, and appealed an order after the court found his objector had no standing and refused to post an appellate bond as ordered. *See,*

13  *e.g.*, *Sullivan v. Kelly Services, Inc.*, No. 08-cv-03893-CW (N.D. Cal.); *Hartless v. Clorox Co*, No.

14  06-cv-02705-CAB (S.D. Cal.); *In re Mercury Sec. Litig.*, No. 05-cv-03395-JF (N.D. Cal.); *In re Broadcom Corp. Class Action Litig.*, No. 06-cv-5036-R (C.D. Cal.); *In re Dell Sec. Litig.*, No. A-

15  06-CA-726-SS, 2010 WL 2371834 (W.D. Tex. June 11, 2010). *See also Hartless*, No. 06-cv-02705-CAB (S.D. Cal.); *In re Mercury*, No. 05-cv-03395-JF; *Rodriguez v. West Publ'g Corp.*, No.

16  05-CV-3222 R (MCx), 2007 WL 2827379 (C.D. Cal. Sept. 10, 2007) (objections overruled, court found objectors added nothing to settlement); *In re Dell Sec. Litig.*, 2010 WL 2371834 (Palmer

17  found in violation of local rules for filing without admission); *In re Lawnmower Engine Horsepower Mktg. & Sales Practice Litig.*, No. 08-MD-01999 (E.D. Wis. 2010) (court overruled

18  objections and required $80,000 bond for appeal); *In re MoneyGram Int'l, Inc. Sec. Litig.*, No. 08-CV-883 (D. Minn. 2010); *In re Initial Public Offering Sec. Litig.*, No. 21-MC-92 (SAS) (S.D.N.Y.

19  2009) (court noted Palmer was professional objector and objection overruled); *The Authors Guild, Inc. v. Google, Inc.*, No. 05-CV-8136 (S.D.N.Y. 2010); *In re Herley Indus., Inc. Sec. Litig.*, No.

20  06-CV-2596 (JRS) (E.D. Pa. 2010) (overruling objection and requiring appeal bond). A then-comprehensive chart of Palmer's objections, clients, and results can be found in *In re: Static*

21  *Random Access Memory (SRAM) Antitrust Litigation*, No. 07-md-01819-CW, (N.D. Cal. Sept. 14,

22  2011, Dkt. 1386-2), a true and accurate copy of which is attached at Exhibit B to the Edelson Declaration).  Palmer has also represented himself in a number of objections, none of which were

23  successful. *See e.g.*, *Berger v. Property I.D. Corp.*, No. 05-5373 GHK (C.D. Cal. Jan. 28, 2009, Dkt.# 899, 900); *see also, In re: Uponor, Inc.*, 11-MD-2247 ADM/JJK (Minn. Sept. 11, 2012) (the

24  court found Palmer's objectors as having evidenced bad faith and vexatious conduct because

25  Palmer's objectors were not even class members, yet he filed an appeal on their behalf) Order at p.5; attached as Ex. C to the Edelson Declaration.  Most recently, in *Arthur v. Sallie Mae, Inc.*, No.

26  C-10-198JLR (W.D. Wash. 2012), the Court found that Palmer filed false declarations with the

27  Court and referred to him as a "professional" [objector] not in any favorable sense"). Transcript, page 16, a true and correct copy of which is attached as Ex D to the Edelson Declaration.

28

1    makes three claims, that: 1) the coupon portion of the Settlement is flawed; 2) a *cy pres* provision

2    is needed; and 3) the Fee Award is excessive. (*See* Dkt. 87.) None of these arguments is sound.

3          **1.**    ***The Palmer Objection fails to show that the Settlement is a "coupon settlement."***

4          The Palmer Objection begins by stating without authority or evidence that the Settlement

5    Agreement is a "coupon settlement," and claims that the cash value of the settlement is only an

6    arguable "future value." (Dkt. 87, at 2.) As discussed in Class Counsel's fee brief, the Settlement

7    Agreement is "neither a 'coupon settlement' nor is it strictly a cash settlement." (Dkt. 86, at 8.)

8    The Certificates instead provide Class Members with flexibility:  there are several different

9    options to draw value in the manner best suited to the preferences of the individual Class Member.

10   The option to receive cash under the Settlement, standing alone, distinguishes the Certificates

11   from a "coupon settlement," and if (as suggested in the Palmer Objection) a Class Member does

12   not want to use the Certificate or wait for a cash distribution, the Certificates can be sold, as they

13   are transferable.  Unsurprisingly, the Palmer Objection mentions nothing about Class Members'

14   ability to transfer the Certificates, as several courts have distinguished settlements from "coupon

15   settlements" by that very characteristic.[11] *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 748

16   (7th Cir. 2001); *Young*, 2007 WL 951821, at *4.  Where the relief entitles a class member to a

17   whole product, much less cash, it is not merely a discount and the relief is plainly not a coupon.

18   *Yeagley v. Wells Fargo & Company,* C05-03403 CRB, 2008 WL 171083, *8 (N.D. Cal. Jan. 18,

19   2008) rev'd on other grounds, 365 F. App'x 886 (9th Cir. 2010); *Chakejian v. Equifax Info.*

20   *Services, LLC*, 275 F.R.D. 201, 215 (E.D. Pa. 2011).

21         From the outset of settlement discussions, Plaintiffs stressed, and Judge Adler agreed, that

22   a coupon settlement simply would not serve the interests of the class. (Edelson Decl. ¶ 11.)  To

23

24   _____

25      [11] The lone case cited to support this objection, *True v. Am. Honda Motor Co.*, 749 F. Supp. 2d
     1052, 1058 (C.D. Cal. 2010), does not support it.  There the settlement provided rebates if class

26   members purchased new Hondas or Acuras within 19 months, had no cash value, and was opposed
     by dozens of states.  749 F. Supp. 2d at 1059, 1069.  *True* defined a "coupon" settlement as one

27   that "where the relief constitutes 'a discount on another product or service offered by the
     defendant in the lawsuit.'"  *Id.* at 1069.  Even under *True*, this Settlement is not a coupon.

28

1    that end the parties, with Judge Adler's guidance and assistance, designed the Certificates to

2    provide *entire* products and services to Class Members, be redeemable for cash, or applied to any

3    other products or services a Class Member wishes to purchase, even if more expensive.  As

4    discussed in Section III(C), Class Members can redeem the Certificates for a number of popular

5    goods and services offered by Jiffy Lube—none requiring any additional payment by Class

6    Members.  The Certificates are also redeemable for cash and transferable, characteristics absent

7    from coupon settlements and making them more desirable by both Class Members and courts.  *See*

8    *Young,* 2007 WL 951821, at *4 (noting that transferable gift cards "enabled class members to

9    obtain cash-something all class members will find useful.") [12]   Each characteristic distinguishes

10   the Certificates from coupons; the presence of all of them only strengthens that distinction.

11          The Palmer Objection also errs by claiming that the Certificates "require Class Members to

12   conduct business with Jiffy Lube, which ultimately benefits Jiffy Lube." (Dkt. 87, at 3.)  It does

13   not, and even if Class Members use the Certificates for Jiffy Lube services, it is not at all clear that

14   Heartland would benefit.  Class Members or transferees can obtain a variety of services at no cost

15   (see *supra,* § III(C)).  As discussed in the fee brief, settlements that allow class members to realize

16   the benefits of the settlement without spending money, without using the relief for the product that

17   gave rise to the litigation, or where class members can obtain an *entire* product at no cost, are not

18   considered "coupon settlements." (Dkt. 86, at 8-9 (collecting authorities)).  The Palmer Objection

19   makes no attempt to distinguish these authorities or apply them to the facts of this case.

20          Because the Certificates in this settlement are not coupons, 28 U.S.C. § 1712 does not

21   apply.  Judge Anello of this District recently noted that "persuasive authority supports" the

22

23   _____

24   [12] Furthermore, the Certificates have immediate value that distinguishes them from a coupon.
     In many "coupon settlements" the relief consists of a discount on a defective product that was
25   recently purchased.  The relief to the class members comes in the form of a small percentage
     discount from an expensive product class members recently purchased and might not again.  Here,
26   the products are used frequently, are not defective in any way, and are inexpensive—the
     Certificates entitle the holder to several products at no cost, and represent a substantial discount on
27   every product or service offered at a Jiffy Lube service center.  *See Radosti v. Envision EMI, LLC,*
     717 F.Supp.2d 37, 63 (D.D.C. 2010) (distinguishing *True,* 749 F. Supp. 2d at 1058).
28

1  position that "CAFA does not apply to settlements, such as this one, that offer the option between

2  cash and vouchers for free products (as opposed to discounts on products where class members are

3  required to purchase the products and pay the difference between the full and coupon-discounted

4  price)." *Shames*, 2012 WL 5392159, at *16.  Because the Certificates offer the option between

5  cash and vouchers for free products, and because they also provide the options of using the

6  Certificates for more expensive products or selling the Certificates, CAFA does not apply.  Even if

7  it did, however, the Court could determine the "economic value" to the Settlement without the

8  "expert testimony regarding redemption rates" sought in the Palmer Objection.  Ignoring the value

9  of the injunctive relief and of the costs of administration and notice (Class Counsel has not argued

10  for the inclusion of these amounts in the value of the common fund), the "economic value" of the

11  Settlement is $35,133,585.00, the cash redemption value of the Certificates.  The Palmer

12  Objection itself recognizes this value, both by acknowledging that the Certificates are redeemable

13  (dkt. 86, at 2), and by suggesting they be sold in order to fund a *cy pres* distribution.  (*Id.* at 3.)

14
           **2.    *The Palmer Objection fails to demonstrate the need for a cy pres***
15              ***distribution.***

16       The Palmer Objection argues, without authority, that a *cy pres* provision is needed in the

17  Settlement.  It is not.  *Cy pres* distributions are appropriate only where "the proof of individual

18  claims would be burdensome or distribution of damages costly."  *Nachshin v. AOL, LLC*, 663 F.3d

19  1034, 1038 (9th Cir. 2011) (citing *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d

20  1301, 1305 (9th Cir. 1990)).  Neither this Circuit nor, to Class Counsel's knowledge, any court has

21  suggested that a *cy pres* component is a mandatory part of a class action settlement.

22       This Settlement is a particularly poor candidate for a *cy pres* distribution—class members

23  are not difficult to locate, and with no claims process, the settlement proceeds are simply mailed to

24  the class members.[13]  Under these circumstances, there is no need to find the next best recipient.

25  _____

26  [13] The fact that the Palmer Objection calls for a *cy pres* distribution through the sale of the
    Certificates (Dkt. 87, at 3) acknowledges the value of the Certificates and undermines its argument
27  that the settlement provides "illusory damages" and "may not supply any value to class members."
    (*Id.* at 2-3.)  If the Objectors want to sell the Certificates to benefit a *cy pres* recipient, they
28

1  And although the distribution of the proceeds comes at some cost, that cost is borne entirely by the

2  Defendants and neither affects Class Members nor diminishes the value of the relief to them.

**3.**     ***The Palmer Objection fails to show that the fee award is excessive.***

4          The Palmer Objection's final argument, that the fee award is excessive, also fails.  Like the

5  other bases for objection, this argument is made with no discussion of the facts of the case or of

6  the Settlement Agreement.  It makes no reference to the fee petition filed by Class Counsel or the

7  arguments or evidence cited therein, nor does it attempt to rebut any of those arguments.

8          Plaintiffs' fee brief, filed on November 19, 2012, devotes nearly eight pages of analysis to

9  why the Court should use the "percentage of fund" method here and why the requested fees are

10  reasonable under that analysis. (Dkt. 86, at 8-16.)  The Palmer Objection makes no attempt to

11  argue that the requested fees are unreasonable under that method.  Instead, the argument begins by

12  assuming, without citation to authority or evidence, that "because of the nature of this settlement

13  and its nebulous value," the lodestar method should be used.  (Dkt. 87, at 3.)  Although the Court

14  could reject the arguments that follow on this basis alone, Plaintiffs will respond to each of the

15  Palmer Objection's arguments and demonstrate their failure.

16          The Supreme Court has "consistently recognized that a litigant or lawyer who recovers a

17  fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys'

18  fee from the fund as a whole." *Boeing Company v. Van Gemert*, 444 U.S. 472, 478 (1980); *see*

19  *also In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) (citing *Six*

20  *(6) Mexican Workers*, 904 F.2d at 1311 ("[b]ecause the benefit to the class is easily quantified in

21  common-fund settlements, we have allowed courts to award attorneys a percentage of the common

22  fund in lieu of the often more time-consuming task of calculating the lodestar . . . .")  The Ninth

23  Circuit agrees, and has routinely recognized the existence of a common fund consisting of relief

24  beyond strictly cash, particularly where the parties agree on the value being provided. *See Wing v.*

25  *Asarco Inc.*, 114 F.3d 986, 990 (9th Cir. 1997) (calculating a common benefit to the class of $67.5

26  ——————————

27  acknowledge that the Certificates have value worth selling.  Class Members would likely prefer to

28  sell any Certificates themselves, so that they (and not a *cy pres* recipient) can receive that value.

1   million in case involving contamination of residential soil, consisting of $500,000 for medical

2   monitoring, $1.5 million for property depreciation, $5 million in cash payments, and a potential

3   $60.5 million in payments dependent on defendant's recovery from its insurance carriers);

4   *Hanlon*, 150 F.3d at 1029 (applying the percentage method to a common benefit comprised of

5   $115 million representing the amount the manufacturer charged against its earnings for the

6   replacement and installation of defective door latches on minivans).  The Palmer Objection cites

7   no authority challenging this case law or discussing how it should be applied here, and instead

8   asks this Court to depart from precedent simply because counsel for the Objectors thinks it should.

9         The Palmer Objection takes issue with Class Counsel's characterization of the result

10   achieved in this settlement as excellent, claiming that Class Counsel provided no factual support

11   for this claim.  This argument is curious for two reasons.  First, Class Counsel provided ample

12   analysis of why this settlement, the largest settlement in text spam litigation history, is a good

13   result for the class.  (*See* Dkt. 86, at 13-14.)  Second, the objection then tries to show how to

14   evaluate the value of the case, using a valuation analysis that the Ninth Circuit recently rejected

15   <u>when Mr. Palmer himself made it</u>.

16         In *Rodriguez v. West Publishing Corp.*, 563 F. 3d 948 (9th Cir. 2009) Mr. Palmer

17   represented objectors to a class action settlement, as he does here.  The Ninth Circuit rejected his

18   submission "that the court should have specifically weighed the merits of the class's case against

19   the settlement amount and quantified the expected value of fully litigating the matter," which (like

20   this objection) relied on the Seventh Circuit's *Reynolds v. Beneficial Nat'l Bank*[14] decision and its

21   progeny.  563 F.3d at 965.  The Ninth Circuit disagreed with the Seventh Circuit's approach,

22   stating that "our approach, and the factors we identify, are somewhat different.  We put a good

23   deal of stock in the product of an arms-length, non-collusive, negotiated resolution, and have

24   never prescribed a particular formula by which that outcome must be tested."  *Id*.  The Palmer

25   Objection's naked reliance on a test that the Ninth Circuit recently rejected from Mr. Palmer

26

27

28   [14] 288 F.3d 277, 284-85 (7th Cir. 2002).

1   himself demonstrates its futility and suggests that it was interposed for an improper purpose, a

2   suggestion made stronger by the failure to cite that very Ninth Circuit case.[15]

3            Furthermore, an attempt to analyze this settlement on the basis of the Seventh Circuit's test

4   would not be appropriate in this case.  A judgment of $500 per class member would result in over

5   a billion-dollar liability.  As noted above, the Defendants' financial limitations posed a significant

6   hurdle to any significant recovery.  Textmarks is a very small company, and Heartland was

7   recently purchased out from bankruptcy, still operates at a loss, and is saddled with a large secured

8   debt (which would take priority over a judgment in bankruptcy).  (Dkt. 79-2, ¶¶ 16-20; *compare*

9   11 U.S.C. §§ 506, 507.)  Bankrupting these two companies would not achieve any relief for the

10  Class Members, and litigating this case to a Plaintiff's judgment would easily do just that.  Courts

11  do not require class actions to destroy the defendants.  *See Hanlon*, 150 F.3d at 1027 ("Of course it

12  is possible, as many of the objectors' [] imply, that the settlement could have been better . . .

13  [s]ettlement is the offspring of compromise; the question we address is not whether the final

14  product could be prettier, smarter, or snazzier, but whether it is fair, adequate, and free from

15  collusion"), *see also Radosti*, 717 F.Supp.2d at 63 (giving consideration to the defendant's

16  financial position in approving a settlement, stating that "[a]lthough a cash settlement would have

17  been preferable to vouchers, [defendant] is not presently in a position to give cash to all class

18  members, and their ability to do so after judgment is also doubtful").  Settling while allowing

19  Defendants to remain in business benefits the class; it allows Defendants to pay them.[16]

20

21  _____

22  [15] The *Rodriguez* case was also discussed in two recent opinions regarding objections in which
    Palmer represented objectors.  In *White v. Experian Info. Solutions, Inc.*, 803 F. Supp. 2d 1086,
23  1104-05 (C.D. Cal. 2011), Palmer represented objector Maria Borbon, and more recently in
    *Dennis v. Kellogg*, 697 F.3d 858, 864 (9th Cir. 2012), Palmer represented objectors Harry Dennis
24  and Jon Koz.  Both reported decisions feature prominent discussion of *Rodriguez*.

25  [16] Further, while the Court declined to entertain Heartland's claim that the statutory liability it
    faced was unconstitutional in light of the standards set by the Supreme Court in *BMW v. Gore* and
26  its progeny (dkt. 54), it is possible that the Court could consider such an argument at summary
    judgment or trial.  *See In re Napster Inc. Copyright Litig.*, MDL 00-1369 MHP, 2005 WL
27  1287611, *11 (N.D. Cal. June 1, 2005) ("At this stage of the proceedings, there is simply nothing
    in the record that would permit the court to apply these '*[BMW]* factors' in an informed manner.")
28

1    In addition to the possibility of a judgment bankrupting the defendants, litigation barriers

2  still provide ample opportunities for the Class to receive no relief at all (*see* §V(A-B), *supra*); it is

3  hard to imagine exactly what the Palmer Objectors would classify as an exceptional result in this

4  case. (Edelson Decl. ¶¶ 9, 11.)  Despite Plaintiffs prevailing on Defendants' motions to dismiss

5  and to compel arbitration, one of those decisions has been appealed and Heartland has indicated its

6  intent to appeal the other.  Even in the opinion denying those motions, the Court specifically left

7  open the due process challenge raised by Heartland, declining "to rule on the due process

8  challenges at this early stage." (Dkt. 54, at 12, fn.12.)  The Court also noted the possibility "that

9  further litigation will determine that no ATDS was used." (Dkt. 54, at 9.)  Either issue, if decided

10  against Plaintiffs, would ensure that the Class receives nothing.  Furthermore, either a summary

11  judgment, a class certification decision, or a trial could result in no recovery to the class, for

12  innumerable reasons.  This argument in the Palmer Objection should be overruled.

13    The final argument raised in the Palmer Objection suggests that Class Counsel and the

14  other attorneys litigated this case inefficiently, doing "inefficient cumulative work" and engaging

15  in a "battle [that] provided no benefit to the Class." (Dkt. 87, at 5.)  Like many of the other

16  arguments in the Palmer Objection, it is curious, and it cites to no record of this "battle" or the

17  "cumulative work."  No such battle ever occurred; in fact, counsel for the plaintiffs in this case

18  self-organized immediately and created this MDL through a joint motion in front of the JPML

19  which was signed by all of the attorneys on the cases then pending. (*See* JPML Dkt. 2261, No. 1.)

20  The motion was filed May 12, 2011, three weeks after the text messages in this case were sent.

21    After the MDL was assigned to this Court, counsel for all Plaintiffs joined in moving for

22  appointment of lead counsel, stating that the attorneys prosecuting the case "are committed to

23  working together to best represent the interests of the putative class in this matter, have worked

24  cooperatively to coordinate these cases through the MDL process beginning shortly after the cases

25  were filed, and have agreed on a leadership structure that will ensure the interests of the class will

26  be protected." (See Dkt. 6, at 1.)  The lack of cumulative work is reflected in the low number of

27  hours expended on this matter by the attorneys other than Class Counsel.  There simply was no

28  duplication of effort in this matter; the Palmer Objection should be rejected on this basis as well.

1    Finally, the Palmer Objection is untimely, and should be rejected per the terms of this

2    Court's October 20, 2012 preliminary approval Order.  The Order provided that:

3           No Class Member or any other person shall be heard or entitled to object … unless
            on or before 45 days after the original date of mailing of the Certificates, *that*
4           *person has served by hand or by first-class mail written objections and copies of*
            *any papers and briefs in support of their position and verification of their*
5           *membership in the Class upon Class Counsel and Counsel for Defendant*, and filed
            the objections, papers and briefs with the Clerk of this court.  Any Participating
6           Class Member who does not object in the manner provided for in this order shall be
            deemed to have waived such objection and shall forever be foreclosed from
7           objecting to the Settlement.

8    (Dkt. 85. ¶11, at 5-6) (emphasis added).  The Order set December 17, 2012 as the deadline to

9    submit objections.  (Dkt. 85, at 8.)  Notice was mailed October 24-30, 2012.  (Azari Decl. ¶ 11.)

10   Neither Class Counsel nor counsel for either Defendant was served with copies of the objection by

11   the Palmer Objectors.  (Edelson Decl. ¶ 25.)  By the terms of the Order, the arguments raised in

12   the Palmer Objection are waived.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL 07-MD-

13   1827 SI, 2011 WL 7575004, *3 (N.D. Cal. Dec. 27, 2011) (failing to follow proper procedures for

14   lodging objection grounds for court "refus[ing] to consider the objection.")

15                   **4.        *The other objections.***

16           The remaining three objections should be overruled as well.  Two are from (presumed)

17   non-attorney Class Members, and one is from an attorney who is also a Class Member.

18           Johnathon Sigward-Waters objects to the Settlement because he does not find Defendant's

19   conduct to be a "[b]ig deal" and suggests instead that they (presumably the Defendants) should be

20   told "not to do it again and move on" because "now they know better."  (*See* Waters Letter,

21   attached as Exhibit 5.)  This objection fails for two reasons.  First, Congress thought that abusive

22   telemarketing practices such as those alleged in this case were important enough to pass the

23   legislation under which this suit was brought.  *Mims*, 132 S. Ct. at 742.  Despite ample opportunity

24   to change the law, Congress has not, and has rejected requests to change the TCPA as recently as

25   last year.  *See* H.R. 3035, *Mobile Informational Call Act of 2011*, 112th Cong. (2011).  Second, an

26   objector's philosophical disagreement with a settlement, without more, does not "impugn the

27   adequacy of the settlement itself."  *Domonoske v. Bank of Am., N.A.*, 790 F.Supp.2d 466, 474

28   (W.D. Va. 2011).  For these reasons, the Waters Objection should be overruled.

1    Cathleen Knutson objects to the Settlement because, "I think it should only be three years
2    time." (*See* Knutson Letter, attached hereto as Exhibit 6.)  It is unclear what Knutson wants to be
3    only three years;[17] any analysis would be pure speculation.  Nonetheless, the instant Settlement's
4    proposed injunctive relief addresses and remedies the core issue of this lawsuit, if in fact this is the
5    portion Knutson finds objectionable. The question is not whether the injunctive or monetary relief
6    is perfect or addresses every conceivable need, but whether it contributes to the Settlement being
7    fair. *Lane*, 696 F.3d at 818 (citing Fed. R. Civ. P. 23(e); *True*, 749 F. Supp. 2d at 1063 (quoting
8    *Hanlon*, 150 F.3d at 1026) ("it is the settlement taken as a whole, rather than the individual
9    component parts, that must be examined for overall fairness.")  This portion, like all terms of the
10   Settlement, was negotiated for by experienced Counsel, provides the Class with exceptional relief,
11   and avoids the uncertainties of continued litigation. The courts of the Ninth Circuit have "long
12   deferred to the private consensual decision of the parties." *Rodriguez*, 563 F.3d at 965.

13   Finally, Robert Caldwell Jr. objects to the settlement on the grounds that 1) "every class
14   member should be receiving $500, not a certificate to Jiffy Lube or around $12.00," and 2) that
15   Jiffy Lube should not be allowed to "commit this offense and STILL advertise by distributing
16   coupons." (*See* Caldwell Letter, attached hereto as Exhibit 7.)  As to the second point, the
17   Certificates are not advertisements (nor are they coupons, as addressed above).

18   As to Mr. Caldwell's first point, he is objecting that that there is a settlement at all, which
19   must be rejected.  If Caldwell did not want to settle his claims, he could have excluded himself
20   from the settlement and then been free to pursue the full statutory penalty. *See In re TD*
21   *Ameritrade Account Holder Litig.*, Nos. C 07–2852 SBA, C 07–4903 SBA, 2011 WL 4079226, at
22   *14 (N.D. Cal. Sept. 13, 2011); *O'Brien v. Brain Research Labs, LLC*, No. 12-cv-204 2012 WL
23   3242365, at *15 (D.N.J. Aug. 9, 2012).  Also, as discussed above, full relief under the TCPA
24   would easily bankrupt both Defendants, and would result in no relief to the Class Members.  A

25

---

26   [17] The only terms of the Settlement that refer to a specific length of time are the injunctive
27   portions that require Defendants to maintain the express written consent of any consumers to
     receive text messages for two years, and the Certificate terms that make it redeemable for up to 18
28   months for goods and services, and an additional 90 days thereafter for cash.

1    settlement does not need to obtain full recovery to be approved.  *See Hanlon*, 150 F.3d at 1027,

2    *Linney,* 151 F.3d at 1241 (overruling objection where objectors offered "nothing more than

3    speculation about what damages 'might have been' won had they prevailed at trial" and stating "it

4    is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation

5    that induce consensual settlements.") (internal citation omitted).  Caldwell's assertion that this this

6    case involves "dead on liability," is also incorrect.  As discussed above, the impediments to

7    obtaining a judgment are not limited to the Defendants' financial condition.  Any one of a large

8    number of factors could result in no recovery to the class members. (*See* Section V(A-B) *supra*.)

9         For the reasons stated above, all four objections should be overruled in their entirety or

10   alternatively, in the case of the Palmer Objection, stricken from the record.  Overall, the small

11   number of opt-outs and objections demonstrates the Class's overwhelmingly positive reaction to

12   the Settlement as a whole, especially when compared to other settlements approved in this Circuit.

13   *Compare Churchill Vill.,* 361 F.3d at 577 (affirming the district court's approval where 45 of

14   90,000 notified Class members objected to the settlement, and 500 Class members opted out of the

15   settlement); *Hartless*, 273 F.R.D. at 641 (settlement approved where only 10 people requested

16   exclusion and three objected out of class of 9000); *In re Mego,* 213 F.3d at 459 (final approval

17   granted in Settlement with one objection out of a potential class of 5400).

18        **I.      There is No Evidence of Collusion**

19        In addition to the other factors discussed thus far, where as here a settlement is reached

20   prior to class certification, courts often require a higher standard of fairness "to ensure class

21   counsel and defendant have not colluded in settling the case."  *Martin*, 2011 WL 2313604, *5

22   (citing *Hanlon*, 150 F.3d at 1026).  The factors most indicative of collusion between the parties are

23   "(1) when counsel receive a disproportionate distribution of the settlement, or when the class

24   receives no monetary distribution but class counsel are amply rewarded; (2) when the parties

25   negotiate a clear sailing arrangement providing for the payment of attorneys' fees separate and

26   apart from class funds; and (3) when the parties arrange for fees not awarded to revert to

27   defendants rather than be added to the class fund."  *In re Bluetooth*, 654 F.3d at 947.  Each of

28   these "warning signs" is designed to root out evidence of collusion that "may not always be

1   evident on the face of a settlement." *Id.* None of these elements are present in this Settlement.

2         First, Class Counsel are not receiving a disproportionate amount of the Settlement and

3   have agreed to receive their fees in Certificates like the relief afforded to the Class.  Moreover,

4   Class Counsel's fees represent only 13.5% of the total common goods/services or cash benefit the

5   Parties agree are being bestowed upon the Class.  This percentage falls well below the Ninth

6   Circuit benchmark of 25% in common fund cases. *In re Bluetooth*, 654 F.3d. at 942; *see also*

7   *Powers v. Elchen,* 229 F.3d 1249, 1256 (9th Cir. 2000).  In addition, the Settlement Agreement

8   does not provide for payment of attorneys' fees separate and apart from funds paid to the Class.

9   *Staton v. Boeing Co.*, 327 F.3d 938, 970 (9th Cir. 2003); *In re Bluetooth*, 654 F.3d at 948-49.

10  Class Counsel is seeking its fees as a percentage of the total value created by the Settlement, and

11  in the same form.  Second, while there is not true "reversion" to Heartland, unredeemed

12  Certificates will expire, but this will not occur for nearly two years after the distribution of the

13  Certificates.  Class Members have 18 months in which to redeem their Certificates for goods or

14  services, and an additional 90 days thereafter to redeem their Certificate for cash.

15        Finally, while there is a "clear sailing" provision in the Settlement, the requested fees were

16  negotiated solely as a percentage of the overall value of the Settlement, inextricably linking Class

17  Counsel's fees to the value obtained for the Class.  (Edelson Decl. ¶ 15.)  The Ninth Circuit's

18  concerns regarding such provisions stem primarily from instances in which the requested fee is

19  agreed upon independently of the amount provided for the class. *In re Bluetooth*, 654 F.3d at 947.

20  Such an arrangement can enable a Defendant to "pay class counsel excessive fees and costs in

21  exchange for counsel accepting an unfair settlement on behalf of the class." *Id.* Such concerns are

22  not present in the instant case, as fees were negotiated as a percentage of the Settlement, and then

23  only after the injunctive and monetary relief to the Class was agreed upon.  These factors again

24  display a lack of collusion between the Parties and favor approval of the Settlement.

25        Both assurances of counsel and the presence of a neutral mediator are factors "weighing in

26  favor of a finding of non-collusiveness," though neither is "on its own dispositive." *In re*

27  *Bluetooth*, 654 F.3d at 948.  Here, Judge Adler, an experienced jurist, presided over the Parties'

28  negotiations and ensured that the settlement process was conducted at arms' length.  Judge Adler's

1  active role in assisting the Parties with their arms' length negotiations and in reaching the

2  Settlement provides strong evidence of non-collusiveness.  Thus, even when scrutinized under this

3  stricter standard of fairness, the Settlement is wholly free of any of the collusive elements

4  addressed in *In re Bluetooth* and represents an extraordinary victory for the Class.

5  **VI.      CONCLUSION**

6          For the foregoing reasons, the Class Representatives respectfully request that the Court

7  grant final approval to the Settlement Agreement.  A Proposed Order shall be separately submitted

8  by email for the Court's consideration in advance of the February 4, 2013, final fairness hearing.

9

10  Dated: December 30, 2012                    Respectfully Submitted,

11                                              Plaintiffs Crowl, Cushnie, Duoung, Heuscher,
                                                Koeller, Souder, and Barr, individually and on
12                                              behalf of all others similarly situated,

13

14                                                _/s/ Michael J. McMorrow_____
                                                One of Plaintiffs' Attorneys
15

16  JAY EDELSON (jedelson@edelson.com)
    EDELSON MCGUIRE LLC
17  350 North LaSalle, Suite 1300
    Chicago, IL 60654
18  Telephone: (312) 589-6370
    Facsimile: (312) 589-6378
19  *Lead Class Counsel*

20  MICHAEL J. MCMORROW (mjmcmorrow@smithmcmorrow.com)
    SMITH & MCMORROW P.C.
21  53 West Jackson Blvd., Suite 1018
    Chicago, IL 60604
22  Telephone: (312) 546-6139
    Facsimile: (888) 664-8172
23  *Lead Class Counsel*

24  DOUGLAS J. CAMPION (doug@djcampion.com)
25  LAW OFFICES OF DOUGLAS J. CAMPION
    409 Camino Del Rio South, Suite 303
26  San Diego, CA 92108
    Telephone: (619) 229-2091
27  Facsimile: (619) 858-0034
    *Liaison Class Counsel*
28

## CERTIFICATE OF SERVICE

  The undersigned certifies that, on December 30, 2012, I caused this document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of filing to counsel of record for each party.


Dated: December 30, 2012           SMITH & MCMORROW P.C.


            By:   /s/ Michael J. McMorrow