IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **Michelle Lee Tannlund**, on behalf of herself and all others similarly situated, | Case No. 1:14-cv-5149 |
| Plaintiffs, | Honorable James B. Zagel |
| v. | |
| **Real Time Resolutions, Inc.,** | |
| Defendant. | |

**Plaintiff's Supplemental Brief in Support of
Preliminary Approval of Class Action Settlement**

Plaintiff and Defendant have worked hard to fashion a fair and reasonable compromise of the claims asserted, which offers substantial cash relief to past and present customers who were called without their prior consent by Real Time Resolutions, Inc. on their cell phones. The settlement is not perfect, but exceeds the minimum requirements of due process. Given that the Court at this juncture need only find that the settlement is within the range of possible approval, preliminary approval should be granted.

**1.      The Settlement Provides Substantial Value to the Class**

The settlement as proposed does not create a common fund for claimants, as is typical in TCPA class action settlements, but instead offers up to $200.00 in credit against a debt not owned by Defendant for each class member who is a current customer and $17.00 cash payment for each class member who is a former customer. Settlement Agreement ("S.A.") (Dkt. 45-1), ¶ 5.01. Nothing in the agreement caps Real

Time's liability to Current Account Holders, which are estimated at roughly half of the 345,000 accounts for potential class members. Ankcorn Decl., ¶ 10 (Dkt. 45-3). If those estimates are wrong and all 345,000 accounts are current and have more than one cellular telephone number called by Real Time, and if everyone called chooses to participate, then Real Time's liability would exceed $69 million.

      **a.**      **Former Account Holders will receive cash**

The settlement provides for a cash payment of $17 for Former Account Holders, defined as anyone who had an account with Real Time that is no longer being actively serviced or someone who never had an account with Real Time. S.A., ¶ 5.01(a). This is estimated to be 170,500 accounts. Ankcorn Decl., ¶ 10 (Dkt. 45-3). A significant fraction of the Former Account Holders, roughly one-fifth of the total class size, is comprised of accounts called on behalf of an entity in a government controlled conservatorship, totaling approximately 73,000 accounts. Ankcorn Decl., ¶ 4 (filed contemporaneously herewith). Those calls were made at the direction of the government controlled entity and were informational in nature, not debt collection. *Id.*, ¶ 5. The entity wanted to ensure that as many borrowers as possible were given opportunities to lower their interest rates and have their mortgages modified to more favorable terms. *Id.* The borrowers were invited to contact a non-profit group, wholly unrelated to Real Time, for more information and to discuss possible modification. *Id.*, ¶ 6. Each account was placed with Real Time for approximately two weeks. *Id.* Another approximately 55,000 accounts of the Former Account Holders estimated total entered into modification or settlement agreements with Real Time and executed a release of claims, including TCPA claims. *Id.*, ¶ 7.

There is a real question whether Real Time has any liability under the TCPA towards these 73,000 accounts given the amendments to the TCPA which exclude from liability calls made on behalf of a servicer of government-owned debt. See 47 U.S.C. § 227(b)(1)(A)(iii). But the settlement agreement includes them in the definition of "Former Account Holder" anyway and deems them eligible to receive a $17 cash payment. S.A., ¶ 5.01(a) (defining Former Account Holder). The remaining Former Account Holders (numbering about 102,000 accounts) also eligible for the $17 cash payment are not prejudiced by including these 73,000 accounts. Each can also receive a cash payment which is only diminished if more than 15,882 Former Account Holders make a claim — which would be a 9.3% claims rate, a shockingly high number for a TCPA settlement. For example, in one recent TCPA class action settlement, there were 8,139 claim forms submitted from 830,593 total class members, for a claims rate of 0.97%, even though the claims administrator in estimated that direct notice was given to 94.5% of the class. *Lees v. Anthem Ins. Cos.*, No. 4:13-cv-1411, Final Approval Order (Dkt. 74), at 2-3 (E.D.Mo., June 10, 2015).[1] By contrast, the Seventh Circuit rejected a settlement that resulted in a claims rate of 6.4 per 1000 class members who received postcard notice, or 0.64%, finding that the structure of the claims process was designed to discourage filing claims. *Pearson v. NBTY, Inc.*, 772 F.3d 778, 782-83 (7th Cir. 2014). It is therefore quite unlikely that the liability cap for Former Account Holders will be reached here. Even if it is, the cash payout will be reduced pro rata, but nothing will be subtracted for costs of administration or attorneys' fees and costs.

---

[1] Despite this very low claims rate and the absence of any disputed motions, class counsel there (which included Burke Law Offices, LLC) were awarded $1.625 million from the common fund. Final Approval Order, at 7. A copy of that order is attached as Exhibit "E" to Declaration of Mark Ankcorn, filed contemporaneously.

b.      **Current Account Holders making a claim will receive $200**

The reductions for current account holders are real dollars, not fictitious discounts or coupons. Each dollar is actual money flowing out of Real Time's account and into the accounts of the creditors who own the debts owed by members of the class, money that Real Time would otherwise be able to retain as a fee that it will forego in favor of the class member claimant's account balance with the third party creditor. Dollar credits against an account balance also avoids transactions costs in sending payments and thereby passes as much value as possible to class members.

The discount amount — $200 — is far higher than other recent common fund TCPA settlements have obtained for class members, including settlements led by Mr. Hurrle's counsel. See, e.g., *In re Capital One TCPA Litig.*, 1:12-cv-10064, Final Approval Order [Dkt. 329], at 42 ("After incorporating the court's reduced fee award, the money available to class as result of the settlement is $54,668,834, which results in a payment to each timely claimant of at least $39.66, and possibly more if some claimants fail to deposit their settlement checks within 210 days."); *Wilkins v. HSBC Bank Nevada, N.A.*, 1:14-cv-190, Final Approval Order [Dkt. 117], at 26 (payment of $101.94).

Unlike recently-disfavored coupon settlements, claimants here are not required to do additional business with a defendant to reap the benefits of the settlement. Most of the class members here are already obligated on mortgage loans, typically a substantial debt of at least fifty thousand dollars, and are paid off over relatively long periods of time, commonly fifteen to thirty years. As a servicer, Real Time is selected by the debt's owner and class members (for better or worse) are stuck with Real Time indefinitely, settlement or no. Class members will already make payments on their loans, or at least be obligated by law to do so, and this settlement ensures that they will

be getting credits for payments they would otherwise make. This is a real, tangible, substantial benefit.

**2.      Objections to Fees are Premature**

Real Time has agreed not to contest an application by Plaintiff's counsel for fees and costs so long as the requested amount does not exceed $685,000 plus an additional $8,858.82 for mediation costs. S.A., ¶ 6.05. Notably, the terms of the settlement are binding regardless of what amount, if any, that the Court awards as a result of such motion. S.A., ¶ 6.04 ("This Settlement is not dependent or conditioned upon the Court's approving Plaintiff's requests for attorney's fees or a payment to class representative."). Mr. Hurrle argues that the fees are "grossly inflated compared to the benefit to the class," based on an erroneous view of the settlement's benefits, an objection disposed of above, and are "collusive" due to the agreement's clear sailing provision wherein Real Time agrees not to object to an application for fees and costs that is at or below $693,858.82. Motion to Intervene (Dkt. 29), at 6. Mr. Hurrle also notes that the Court will not be able to determine the payout to the class at the time fees are decided, which he says is in direct conflict with recent Seventh Circuit authority. Supp. Filing (Dkt. 48), at 4.

However, at the time of final approval, the Court will know how many claimants have enrolled in the Current Account Holder bonus program and how many Former Account Holders have submitted a claim for a $17 check. With these numbers, it will be possible for the Court to estimate with a high degree of confidence the total amount that the class members will actually receive, and use that figure to award fees. The Court is not required to defer an award of fees and costs until the end of the year-long

5

payment period for Current Account Holders; the Seventh Circuit rejected that idea in *Redman v. RadioShack Corp.*, 768 F.3d 662, 634 (2014) ("There is no need for a rigid rule"). And in any case that discussion in *Redman* was an interpretation of the statutory requirement for coupon settlements, not the sort of procedure proposed here. *Id.*, at 633-34 (discussing Class Action Fairness Act, 28 U.S.C. §§ 1712(a) and (b)(1), described as a "badly drafted statute").

The settlement agreement as drafted creates a significant incentive for class counsel to increase the claims rate, to justify a fee award. Nothing in the agreement prevents class counsel from asking for fees and costs in excess of $685,000, but of course at that point Real Time's counsel is free to oppose it. Nevertheless, if class counsel's efforts result in 30,000 people filing claims to participate in the Current Account Holder bonus program, the anticipated benefit to the class would be $6 million. Under the Seventh Circuit's presumptive fee benchmark, a fee award of $3 million might be appropriate. *Pearson*, 772 F.3d at 782 ("the presumption should we suggest be that attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel.")

In any case, the Court need not address any of these issues which at this stage are entirely speculative. The settlement as structured complies in all material respects with the recent guidance from the Seventh Circuit in *Pearson*, *Eubank*, and *Redman* with respect to fees for class counsel and should be preliminarily approved.

**3.    Notice by Publication is Reasonable, Even if Not Ideal**

Next, Mr. Hurrle has raised objections to the notice provisions outline in the settlement, which provides for notice by publication but does not require direct notice

to identifiable class members. This, Mr. Hurrle argues, runs contrary to Rule 23(c)(2)(B) because it is "unreasonable" under the circumstances. Hurrle Supp., at 2-3. He further takes issues with the absence of a declaration from the retained settlement administrator, but cites no authority for such a requirement, as well as the absence of highly privileged and confidential documents between Real Time and its creditor clients, again without authority. *Id.*

This Court has previously approved class action settlements with publication-only notice, finding that it is appropriate "where potential class member names were confidential or impracticable to ascertain." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 476 (N.D. Ill. 2009) (Zagel, J.). Here, Real Time is bound by the strict confidentiality terms of its contracts with the creditors who hire it to service their loans to use the borrowers' private information only in the performance of Real Time's servicing. Ankcorn Decl. (Dkt. 45-3), ¶ 11. At least one of the contracts expressly requires Real Time to oppose with all lawful means the disclosure of borrowers' contact information to any third party for any purpose. *Id.*

Nevertheless, this Court could order Real Time to turn over this data to Plaintiff's counsel or to a third party administrator who would be similarly bound by the terms of the Agreed Confidentiality Order (Dkt. 42) already in place in this litigation. The Court could also order Real Time to include a "bill stuffer" in the monthly statement sent to some borrowers, alerting them of their possible eligibility for the bonus program. Real Time might also have email addresses for at least some of the potential class members, making direct notice cost-effective. None of these options would require Real Time to breach its contractual obligations to its clients, but Real

Time cannot agree to (and indeed must oppose for at least one client) do any of these actions voluntarily. Ankcorn Decl., ¶¶ 8-11.

Plaintiff would be delighted with participation by as many class members as possible. The benefit to each person is not diminished at all by others' participation, unlike a closed-end common fund where distribution is pro rata. In fact, Plaintiff pushed for direct notice from the very outset of settlement negotiations and only agreed to the present term of publication-only after Real Time's repeated insistence that it could not legally do so — representations that were accurate and supported by confirmatory discovery and the specific language in several contracts between Real Time and its clients. Ankcorn Decl., ¶¶ 12-13.

Plaintiff believes that publication-only notice in the present circumstances meets the requirements of due process. But Plaintiff would support the Court's order for direct notice and her counsel would work vigorously to ensure that the claims rate was as high as possible.

**4.    The Claims Form and Process are Simple and Obvious**

The claim form here is clear and simple and does not "strew[] obstacles in the path" of claimants as Mr. Hurrle argues and as the Seventh Circuit in *Eubank* warned against. The proposed claim form is short, to the point, requires no declaration under penalty of perjury, does not require a claimant to submit documentation or paperwork, and asks only for a claimant to certify that she received a phone call during the class period on her cellular telephone and didn't give Real Time permission to call. Claim Form (Dkt. 45-2).

This is a far cry from the complexity in other forms used in other TCPA class action settlements, including ones where Mr. Hurrle's counsel were representing the settling classes. See, e.g., *Rose v. Bank of America Corp.*, 5:11-cv-2390 EJD (N.D.Cal.), Dkt. 59-1 (attached as Exhibit "_"); *Steinfeld v. Discover Fin. Svcs.*, 3:12-cv-1118 (N.D.Cal.), Dkt. 49, at 158 (attached as Exhibit "_"). Indeed, it is difficult to see how the proposed claim form and process here differs in any meaningful respect from two other class actions settlements involving Mr. Hurrle's counsel. *In re Capital One TCPA Litig.*, 1:12-cv-10064 (N.D.Ill.), Dkt. 123-1, at 51 (attached as Exhibit "_"); *Hashw v. Dept. Stores Nat'l Bank*, 13-cv-727 RHK (D.Minn.) (attached as Exhibit "_").

The Seventh Circuit has cautioned against creating a claims process that is so complex that claims will be deterred. *Pearson v. NBTY*, 772 F.3d 778, 783 (7th Cir. 2014). But the hurdles that the *Pearson* decision noted were requirements like attaching receipts, furnishing documentation showing the date and store where the product was purchased, threats of criminal prosecution, certification under penalty of perjury — all to receive $5 per bottle purchased, with a maximum of ten bottles. *Id.* In another case, the Seventh Circuit rejected a settlement that required a claimant to submit a "slew of arcane data" like purchase order numbers, glass etch information, product identity stamp, and so on, to receive $750 for a defective window. *Eubank v. Pella Corp.*, 753 F.3d 718, 725-26 (7th Cir. 2014). None of those concerns are present here, unlike, for example, the claims process created in another TCPA case by Mr. Hurrle's counsel in a settlement that is awaiting final approval. Frequently Asked Questions, at ¶ 6(3) (describing tiered recovery for submitting cell phone bill or bill history) in *Newman v. Americredit Fin. Svcs, Inc.*, No. 3:14-cv-476 DMS (S.D.Cal.) (available from settlement website as of January 21, 2016 at www.NewmanAmeriCreditSettlement.com).

Continued payment of the debt for current customers presents no real obstacle. If a class member doubts that she can make $2,000 in payments in the twelve months following approval, she can opt out and present her claims on an individual basis. And because these are mortgage loans running into the tens of thousands of dollars on average, it is very unlikely that a potential claimant evaluating her options wouldn't be able to meet this relatively low threshold. Furthermore, if a class members are current — even on a modified loan payment plan — they need not vary from the regular, usual payments they are already making to receive the benefit of the settlement. All they need to do is sign up. If they are behind, the settlement's bonus provides an extra incentive to catch up on payments and remain current. Notably, payments that are less than the contract obligation ($200 per month instead of $750, for example) still qualify under the terms of the settlement. S.A., ¶ 5.01(b) (timely claimants "shall receive a reduction of two hundred dollars ($200) off the amount that is still owed . . . [if the claimant] makes a payment of two thousand dollars ($2,000) against his or her Outstanding Account Balance."). Any payment, even untimely and less than due, whether in a lump sum or otherwise, will count towards the threshold.

The claims process here is as simple as possible, requesting only contact information for the claimant, the target phone numbers (if known), and a brief statement that the claimant believes he or she fits the class definition. Claim Form (Dkt. 45-2, at 2-3). After that, the claimant need to do nothing more than make payments in some amount that total $2,000 over the next year, or in the case of Former Account Holders, do nothing at all but cash the check for $17 when it arrives. It is hard to imagine how much simpler the claims process could be made, and notably

proposed intervenor suggests no improvements other than that the settlement be rejected in its entirety.

**5.      Class Counsel Will Protect and Have Protected the Interests of the Class**

Mr. Hurrle suggests that the proposed settlement is so hostile to the interests of the proposed class that preliminary approval be denied, accusing Ms. Tannlund and her counsel of selling out the class with "a deficient settlement" and "secretly negotiate[d] away the rights of Mr. Hurrle and the class he seeks to represent without ever testing the soundness of Ms. Tannlund's claims or Real Time's defenses." Motion to Intervene (Dkt. 29), at 10-11. Plaintiff's counsel is also deemed inadequate because he supposedly "agreed to settle a proposed nationwide class action that provides little to no relief to the class and at the same time awards him nearly $700,000." *Id.*, at 9.

This accusation is surprising as it comes from attorneys with whom the undersigned counsel has worked closely on several TCPA class actions, at least two of which have settled without ever "testing the soundness of claims or defenses." See, e.g., *Steinfeld v. Discover Fin. Svcs.*, 3:12-cv-1118 (N.D.Cal.) (settlement of $8.7 million without ruling on motion to dismiss; final approval granted); *Gehrich v. Chase Bank USA, N.A.*, 1:12-cv-5510 (N.D.Ill.) (settlement of $34 million without contested motion; final approval pending).

The undersigned counsel joined with the Terrell Marshall firm, counsel for Mr. Hurrle, in prosecuting the following TCPA class actions in addition to *Steinfeld* and *Gehrich*: *Rose v. Bank of America, N.A.*, 5:11-cv-2390 EJD (N.D.Cal.) (with Burke Law Offices, LLC); *In re Capital One TCPA Litig.*, 1:12-cv-10064 (N.D.Ill.) (nationwide settlement of $75.5 million); *Magyar v. Dell, Inc.*, 3:12-cv-1899 (S.D.Cal.); *Cayanan v. Citi*

*Holdings, Inc.*, 3:12-cv-1476 (S.D.Cal.); *Selby v. Deutsche Bank Trust Co. Americas*, 3:12-cv-1562 (S.D.Cal.). Moreover, the first TCPA class action filed against Real Time was jointly prosecuted by Terrell Marshall and the Ankcorn Law Firm. *Cloud v. Real Time Resolutions, Inc.*, 3:12-cv-1470 JAH (S.D.Cal.). In fact, the Ankcorn firm and Terrell Marshall are co-counsel in a TCPA class action currently pending in this District. *Snyder v. Ocwen Loan Servicing, LLC*, 1:14-cv-8461 MFK (N.D.Ill.).

Mr. Hurrle and his counsel may not like the settlement as proposed. They are certainly free to file an objection once the claims period is opened and a fairness hearing set. But in light of his counsel's extensive and ongoing professional work with the undersigned counsel, any claim that Ms. Tannlund and her attorneys are unable to protect adequately the interests of the class rings hollow.

///

**Conclusion**

The proposed settlement provides real, tangible benefits to class members, well above many TCPA class settlements that have been approved by courts across the country and in this District, including several in which Mr. Hurrle's counsel acted as class counsel. The notice plan is fair and reasonable as described, but Plaintiff would have no objection to the Court's imposing more strict direct notice that the parties were unable to agree to voluntarily owing to Defendant's contracts with its clients. The settlement should be preliminarily approved.

Respectfully submitted,

ANKCORN LAW FIRM, PC

*/s/ Mark Ankcorn*

Attorneys for Plaintiffs

11622 El Camino Real, Suite 100
Del Mar, California 92130
(619) 870-0600 phone
(619) 684-3541 fax
*mark@ankcorn.com*

Local Office:
Ankcorn Law Firm, PC
1608 S. Ashland Ave. #92015
Chicago, Illinois 60608-2013

## Certificate of Service

I hereby certify that on January 22, 2016, I electronically filed the above and foregoing through the Court's CM/ECF System, which perfected service on all counsel of record.

*/s/ Mark Ankcorn*